Memorandum of Decision
This is a petition for the termination of the parental rights of the mother and father of Jessica M. filed by the Commissioner of the Department of Children and Families (DCF). The father has consented to the termination of his parental rights and they have been so terminated.
The petition for termination of parental rights was filed on July 27, 1998. That, therefore, is the adjudication date. The disposition date is February 8, 1999.
The petition alleges as grounds for the termination of the parental rights of the mother Julie F. that (1) she has abandoned Jessica in the sense that she has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of Jessica (General Statutes section 17a-112(c)(3)(A)); and/or (2) there is no ongoing parent-child relationship between her and Jessica that ordinarily develops as a result of a parent having met on a continuing, day to day basis, the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or re-establishment of the parent-child relationship would be detrimental to the best interests of the child (General Statutes section 17a-112(c)(3)(D)); and/or (3) the child has been found in a prior proceeding to have been neglected and the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief within a reasonable period of time, considering the age and needs of the CT Page 2171 child, she could assume a responsible position in the life of the child (General Statutes section 17a-112(c)(3)(B))
The petitioner must prove by clear and convincing evidence the facts to support the ground(s) alleged, and, that termination of the parental rights of the mother is in the best interest of Jessica M.
The procedural history of this family's involvement with DCF and the child protection courts is inextricably woven in to the facts and circumstances of this petition. This court laments that the interface between this family, DCF and the child protection courts has stretched over the entire life of Jessica who is now 8 years old.
The court finds the following facts have been proven by clear and convincing evidence. Jessica M. was born on October 29, 1990. She resided with her parents who were married at the time of her birth. On November 28, 1990, when Jessica was just one month old she was brought to the hospital by her mother. Her mother had struck her on the left side of the head. Initially she denied it. Examination disclosed that Jessica also had injury on the right side of her head that had been inflicted on an earlier occasion. Ultimately, in response to investigation, Jessica's mother acknowledged that she had, indeed, struck Jessica in the head on two different occasions. She stated that she had used an open hand. Jessica's skull was fractured. DCF invoked a 96 hour hold on the infant; an order of temporary custody was issued by the court. DCF filed a neglect petition and a co-terminous petition for the termination of parental rights. The latter was subsequently withdrawn by the petitioner. Jessica was adjudicated neglected and committed to the custody of the Commissioner on March 15, 1991. The court found that it was contrary to the best interests of Jessica to remain in her parents' home. Services were provided to the parents toward the goal of reunification. Those services were parenting education and counseling. Jessica was returned by DCF to her parents' home on October 10, 1991. She was just under one year of age. DCF continued the above services and also provided a parent aide in the home. On June 15, 1992, DCF filed a petition to revoke Jessica's commitment. That petition was granted by the court, effective October 10, 1991. DCF continued to provide protective services to the family until July 7, 1992, at which time they were no longer involved with the family. CT Page 2172
How Jessica fared with her family from July 7, 1992 until March 9, 1995 is not known. On March 9, 1995, when Jessica was 4 years of age, DCF received a referral on the family from a worker at a battered woman's shelter. Jessica was there with her mother. The worker observed marks on the body of Jessica. Jessica had bruises on the back of her legs and her legs and her buttocks. When displaying her bruises she spontaneously told the DCF worker that her mommy and daddy hurt her. She also had rotten teeth visible to the casual observer. On inquiry with the mother she disclosed that she had again hit Jessica in the head with a closed fist. She also acknowledged that the 1990 assaults were both with a closed fist and that she had lied previously about the assaults being with an open hand.
The DCF worker offered the mother a parent aide, parenting classes and counseling. He also referred her to Catholic Family Services. She responded in the negative: she refused the services. She told the worker that these services had not worked before and they would not work now.
DCF invoked a 96 hour hold on Jessica. They then filed for and received an order of temporary custody of Jessica. Coincident with that, the department filed a neglect petition. From March 10, 1995 to the present time Jessica has been in the custody of DCF.; from age 4 to age 8 Jessica has been in the custody of DCF in foster care. Jessica is in her second foster home. Her first foster parents asked for her removal because they found her behavior too much to handle. She had tantrums and aggressive and abusive behavior to others. She withheld her feces and urine. She was self-destructive in that she picked at her hands and fingers to the point of their becoming bleeding and infected. This condition was observed by her DCF worker.
She came to live with her present foster parents in August, 1996. Her foster father drove her to her visitations with her mother. On two occasions she soiled her pants en route and declared that they could not then go to the visit. When she came to live with this family they integrated her into their family. They provided a schedule that has a foster parent at home with her before and after school. She takes dance and singing classes; they include her in all family events. When she came to live with them, she had fine motor skill problems and speech problems. She could not attempt three syllable words. She dropped the first syllable off a two syllable word. The school system provided her speech and occupational therapy which the foster parents CT Page 2173 reinforced with activities in the home. They have helped her grow from a child who needed to repeat kindergarten to a child who is now on grade level academically and thinks about going to college someday. The foster mother has a graduate degree in special education. She has taught emotionally disturbed children in school systems. Her skills are particularly suited to Jessica's needs. Jessica refers to her foster parents as mom and dad. Her foster parents love her as their own daughter. If she were free for adoption, they would immediately adopt her.
DCF filed a petition for the termination of the parental rights of Jessica's parents and the neglect petition was consolidated with it on April 26, 1995. The grounds to terminated were (1) parental acts of commission or omission and (2) failure to rehabilitate.
That co-terminous petition was tried to the court from September, 1995 to April, 1996. The court (Petroni, J.) found Jessica neglected and dismissed the termination petition. He committed Jessica to the Commissioner for one year and ordered "DCF to provide both parents, who are presently separated, with intensive rehabilitation services, and additional supervised visitation." That commitment by motion and hearing has continued to the present time.
On April 15, 1998, the court (Petroni, J.) commenced a hearing on DCF's motion to find no further efforts were necessary by the department and a motion for contempt filed by the father. The court never completed that hearing. At that hearing, Dr. Schwartz testified. His testimony was summarized as follows: ". . . that neither parent would benefit from any rehabilitative services. Additionally, he does not deem them capable of providing the care that Jessica needs, either individually, or as a couple." (Exhibit 1a). This assertion of his testimony was unrebutted and unchallenged at trial and therefore, this court finds by clear and convincing evidence that this is his professional opinion after evaluation of this family.
Jessica has been in individual therapy with a clinical psychologist, Dr. Pines, since August, 1996. She was brought for therapy by her present foster parents when she came to live with them. She presented as a child with oppositional defiance. She fought yes/no battles with her foster parents over even the most insignificant matters. She had major control problems. She had temper tantrums, regressive behavior of a child much younger than CT Page 2174 her years, frequent nightmares, resistance to affection from her foster parents, aggression-saying mean things and hitting her peers. She always had to be first in line. She had poor relationships with her peers. Dr. Pines diagnosed Jessica as suffering from a reactive detachment problem: she was unable to trust her caretakers. This condition is usually present in children who have suffered loss or maltreatment in their first few years of life. She was also diagnosed as suffering post-traumatic disorder. He attributed this disorder's cause to be the care Jessica received from her parents in her early years.
As of January 16, 1997, Dr. Pines wrote regarding Jessica: ". . . her behavior changes dramatically when Julie's name is introduced. She becomes more self-distracting and attempts to avoid and evade any discussion about her mother. Her play becomes more aggressive and fragmented and less sustained and focused. Her anxiety level changes in our sessions and overall she becomes less compliant, more negative and regressive.
"Once the conversation moves from Julie, her behavior returns to more appropriate levels and her anxiety decreases. I do not take these changes as an indication of a healthy attachment to her mother, but a sign of intense feelings of insecurity and lackof safety at the mere mention of her name. (Emphasis added.)" (Exhibit 3).
The mother, Julie, met with Dr. Pines just prior to April 7, 1997. She brought her fiancé with whom she was living, to the meeting. She told Dr. Pines that she ". . . believes herself to be rehabilitated with improved parenting skills. Since she lives with her fiancé's son, she provides this as evidence of her ability to care for a child. Julie feels she no longer needs counseling or parenting classes. According to Julie, she has an improved home and life style and is able to now support Jessica." (Exhibit 4). She also discussed having missed many scheduled visits with Jessica. She blamed it on her work. She minimized the injuries that had occurred to Jessica as an infant. She told Dr. Pines that `the doctors told her not to worry about it.'
On August 14, 1997 the court (Petroni, J.) found DCF in contempt for failure to provide the family with `intensive rehabilitation services.' He also ordered the termination of the parents' visitation with Jessica until the completion of an evaluation by a psychiatrist, Dr. Herbert Schwartz. That CT Page 2175 visitation has remained terminated to the present time.
Jessica's mother was offered services of counseling and parent aide and parenting education classes on March 9, 1995. She refused them. She did secure counseling on her own at agency reference from the battered women's shelter. Her DCF worker spoke with her counselor about her emotional issues, particularly controlling her anger. Her concerns remained intact after that conversation. The mother stopped her counseling some time in the summer of 1996. She has never recommenced it.
After the decision of the court (Petroni, J.)ordering the department to provide `intensive rehabilitation services' to the parents in September, 1996, the Department prepared a proposed service agreement which was forwarded to the mother's attorney. In it the DCF worker who authored it offered to "[m]ake referral to any and all services required by the parents, including (but not limited to) individual and couples' therapy; treatment for anger management; substance abuse assessment, testing, and treatment; services for supervised visitation; parenting skills training programs; and others, as needed."
A subsequent proposed service agreement provided by the same worker dated September 12, 1997 restated that offer. Neither service agreement was ever signed. DCF concedes that neither of these statements were accompanied by specific referrals with names and telephone numbers of providers. The mother never contacted DCF seeking a referral to a service provider.
The mother has telephoned DCF two times to speak to the worker in the last one and one-half years. The first time she called was in August, 1997. The purpose of her call was to notify DCF of a changed address for her. She did not inquire after Jessica; she did not ask how she was doing. Her second call was on February 14, 1998. Her purpose in calling was to inform the worker that she had just moved back to Connecticut from Florida. She made no inquiry about Jessica at all. The mother saw the case worker on two occasions in the last year, in August, 1998 and October, 1998. On neither occasion did she inquire after Jessica. (Both of these are post-adjudicative dates). In the last one and one half years, the mother has sent no cards to Jessica. She has provided one gift on October 29, 1998.
The DCF worker has held administrative case reviews regarding Jessica on October, 1997, March 20, 1988 and October, 1988. CT Page 2176 Parents are invited to these reviews. The mother only attended the October, 1997 date.
The trial of this petition for termination of parental rights was held on February 8, with closing argument on February 9, 1999. The mother did not attend court on February 8, 1999. Pursuant to the Petitioner's Motion for Judicial Notice which was granted at the commencement of the trial, the court took judicial notice of various items listed in the motion. The petitioner presented 7 witnesses and submitted 17 exhibits. The witnesses were one DCF supervisor, three DCF workers, the foster mother and foster father and the child's treating psychologist. Neither the mother nor the minor child presented any evidence or witnesses. Each were represented by counsel throughout the proceedings. Each was active and thorough in their cross-examination of the petitioner's witnesses.
1. Abandonment claim
DCF petitions the court for the termination of the parental rights of the mother, Julie, asserting that she has abandoned Jessica in the sense that she has failed to demonstrate a reasonable degree of interest, concern or responsibility as to the welfare of her. General Statutes § 17a-112 (c)(3)(A). In the time since the court's decision of September 25, 1996 Jessica's mother has initiated no contact with DCF to determine the welfare of Jessica. She has no expressed no concern about her welfare. She has not attempted to send her any communication, gifts or cards through DCF from the termination of her visitation on or about August 14, 1997 to the date of the filing of this petition on July 27, 1998. In June and July of 1997, the mother saw Jessica once each month for 90 minutes. Her visitation had been scaled back because of its adverse effect on Jessica. On the couple of occasions that she initiated contact with DCF to notify them of address changes she did not ask one question, even in passing, as to the health, well-being or welfare of her daughter. Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. In re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 14, 438 A.2d 801 (1981). The loss of visitation was a result of a court order. The absence of any contact by way of letter, cards, or gifts was a result of the mother's own failure to demonstrate any love or affection for Jessica. The failure to inquire after the welfare of Jessica constitutes a painfully CT Page 2177 exquisite exposition for the court that Jessica's mother has no concern for her welfare. On this ground, and the other grounds, petitioning for the termination of the parental rights of Julie in Jessica, she through her counsel's closing argument seeks to excuse the inaction of the mother because of the conduct of DCF. However, "[a]bandonment focuses on the parent's conduct. "In reMichael M., 29 Conn. App. 112, 121, 614 A.2d 832 (1992); In reRayna M., 13 Conn. App. 23, 36, 534 A.2d 897 (1987).
"Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child. In re Luke G., 40 Conn. Sup. 316, 323, 498 A.2d 1054
(1985); . . . [Section} 17-43a (b)(1) does not contemplate a sporadic showing of the indicia of `interest, concern or responsibility for the welfare of a child.' A parent must maintain a reasonable degree of interest in the welfare of his or her child. "Maintain' implies a continuing, reasonable degree of concern' In re Rayna, supra, 37-38; In re Migdalia M.,6 Conn. App. 194, 208-209, 504 A.2d 533, cert.denied, 199 Conn. 809,508 A.2d 770 (1986)." In re Michael M., supra. This court finds that DCF has proven by clear and convincing evidence that Jessica's mother has abandoned her for she has made no attempt whatsoever to achieve any contact with Jessica or express any concern for her welfare, and, that this situation has existed for more than one year prior to the filing of the petition.
2. No ongoing parent-child relationship claim.
As the second ground for the petition to terminate the parental rights of Jessica's mother, DCF claims that her mother has no ongoing parent-child relationship with Jessica, "which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes Sec. 17a-112(c)(3)(D)
By January, 1997, after seeing Jessica at least a dozen times, Jessica's therapist had determined that any contact at all with her mother was not good for her. "I believe it is far more than a passing coincidence that Jessica's longest period of appropriate behavior with the [foster parents] coincides with the CT Page 2178 time period when Julie missed several visits. At present, Jessicas' [sic] abilities to verbalize her feelings are undeveloped. She uses her behavior to communicate her feelings. The behaviors described by the [foster parents] as well as the behaviors observed by myself, indicate a child who does not feel safe and secure in the presence of her mother." (Exhibit 3, p. 2).
In April, 1997, the mother-child visits were scaled back to one time per month. The mother has had no visitation with Jessica since August, 1997. She has initiated no other form of contact or communication with Jessica. When there was contact Jessica displayed a variety of expressions, all negative in nature, about her continued contact with her mother.
"It is reasonable to read the language of `no on-going parent-child relationship' to contemplate a situation in which, regardless of fault, a child . . . has definitely lost that relationship, so that despite its former existence it has now been displaced. In either case, the ultimate question is whether the child has no present memories or feelings for the parent." Inre Juvenile Appeal (Anonymous), 177 Conn. 648, 670, 420 A.2d 875
(1979).
The parent-child relationship between Jessica and her mother was punctuated by pervasive acts of violence by the mother committed upon the child. The effect of these acts of violence on Jessica cannot he underestimated. As a result of these acts in the context of Julie's parenting of Jessica, Jessica does not express positive feelings about her mother. She is uncomfortable when her name is mentioned. To her foster father, she expresses that her mother has taught her the aggressive conduct of hitting. The whale her mother gave her at a visitation is utilized to hit her repeatedly over the head. She defecated in her pants on two separate visitation dates and then declared that she could not go see her mother. No where in the evidence was there elicited any positive memory or emotion that Jessica holds of her mother. Jessica has emotions or feelings regarding her mother. However, none are positive; they all relate to her emotional discomfort and distress. This is not a sufficient ongoing relationship. "We must conclude, therefore, that the phrase `feelings for the natural parent' refers to feelings of a positive nature." In reJuvenile Appeal (84-6), 2 Conn. App. 705, 709, 483 A.2d 1101
(1984). The court finds that the petitioner has proven by clear and convincing evidence that there is no ongoing parent-child relationship as defined by statute and case law between Julie and CT Page 2179 her daughter Jessica and that the condition has existed for more than one year preceding the filing of the petition.[2]
It is not in the best interest of Jessica to allow any further time for her mother to establish a positive on-going parent-child relationship with her. The mother expresses no insight as to the severity of her physical abuse of her daughter. She told Dr. Pine that she does not feel Jessica has any significant emotional difficulties. The mother's lack of insight as to her own negative behavior and its effect of Jessica does not bode well for her showing sufficient growth to work with the process that would be necessary to transform her negative relationship with her daughter to a positive one. Jessica has not seen her mother in one and one-half years. If that passage of time of no contact is not sufficient to provide the mother with initiative to begin to remedy and repair her relationship with her daughter, then none is. Jessica at age 7 when the petition was filed (and now age 8) has an urgent need for permanency. She has spent almost half her life in foster care, each time occasioned by her mother's physical abuse of her. It is not in her best interest to attempt any longer to repair a relationship that has been fractured each time by her mother's indecent and uncivilized behavior toward her.
3. Failure to rehabilitate ground
The petitioner also claims that the parental rights of Julie should be terminated as a result of her failure to rehabilitate as the same is defined by statute and case law. The statutory ground requires a finding by clear and convincing evidence that ". . . the child has previously been adjudicated neglected and the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, such parent could assume a responsible position in the life of the child. General Statutes 17a-112(c)(3)(B).
Jessica was adjudicated neglected on October 2, 1996. At that time DCF was ordered to provide intensive rehabilitation services to the family. On September 10, 1997, DCF was found in contempt after the court found that it had failed to follow that court order. The determination that DCF was in wilful contempt of the court order to provide intensive rehabilitation services is dispositive, here, only of the question as to whether DCF provided rehabilitation services, as court ordered, as of the CT Page 2180 date of the contempt hearing.[3]
Thereafter, DCF prepared a service agreement that was never signed. DCF never provided telephone numbers or names of service providers to the mother. The mother never requested services from DCF. She had received services from DCF in the past; therefore, it can not be said that she did not know that services were in fact available from the petitioner. A psychological evaluation of the mother in March, 1995 found her to ". . . react to situations impulsively with anger, show poor judgment, demonstrate a remarkable lack of insight and possess very limited coping skills." (Exhibit 1a, p. 16). In March, 1995, the mother told DCF she did not want services because they had not worked when provided before. A second psychological evaluation in October, 1995 found the mother ". . . falls short of having the skills to manage and care for Jessica." (Id). Further, that evaluator, Dr. Barile concluded that the mother's problems could not be cured with relatively brief period of counseling. (Exhibit 1a, p. 23).
She stopped her own counseling in the summer, 1996. On or about December 17, 1996 the mother sought an administrative treatment plan hearing with DCF. On or about February 21, 1997 she had canceled her request for a treatment plan hearing with DCF. (Exhibits 5 and 6). By April, 1997, Jessica's mother had told Dr. Pines that she believed that she was rehabilitated and ready to take Jessica home. On April 15, 1998 Dr. Scwartz, the court appointed evaluator testified that he did not think that the mother would benefit from rehabilitative services. (Exhibit 1a).
DCF could easily conclude that it would be futile to offer additional services under the circumstances where the mother has not demonstrated an interest in, and, is unwilling to avail herself of services. This court concludes and finds by clear and convincing evidence that (1) from the mother's lack of initiative in her failing to even once seek services so that she might become the caretaker of her child, and (2) her statements in 1995 to the DCF worker (Wrobel) that services had not worked in the past and would not work now, and then finally, (3) her statement to Dr. Pine in 1997 that she needed no services for she felt she was rehabilitated, and (4) Dr. Scwartz's conclusion that services would provide no benefit, that it would have been futile to provide rehabilitative services to the respondents in an attempt to reunite the family. In re Kezia 33 Conn. App. 12/, 24 (1993) "The law does not require the doing of a useless thing." FederalCT Page 2181Finance Co. v. Forman Properties, Inc., 135 Conn. 153, 158,62 A.2d 516 (1948); Corsino v. Grover, 148 Conn. 299, 308
(1961).
None of the evaluators, whose opinions largely came in through the social worker's social study and testimony, express any confidence that the mother can presently or in the near future assume parenting responsibilities for Jessica. She is not willing to help herself toward that goal. Her acts of violence, beating Jessica, have recurred. The verdict she gave herself in March, 1995 speaking with social worker Wrobel is that the rehabilitative services did not work the first time so there is no reason to think they would work this time.
The language of our statutes make it clear that in assessing a parent's rehabilitative prognosis, it must be viewed in the context of what is "within a reasonable time, considering the age and needs of the child". § 17a-112(b)(2). See also In re LuisC., 210 Conn. 157, 167, (1989); In re Davon M., 16 Conn. App. 693,548 A.2d 1350 (1988). Considering that Jessica is now eight (seven at the filing of the petition) and has spent almost half her life in foster care (this time since March, 1995) it is not realistic to consider even the possibility that her mother will rehabilitate in a reasonable period of time, considering Jessica's needs.
The court finds that the petitioner has proven by clear and convincing evidence that Jessica has been found neglected in a prior proceeding and the mother Julie has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age of Jessica and her needs, that Julie, the mother, could assume a responsible position in Jessica's life.
Required findings
The court makes the following factual findings required byGeneral Statutes section 17a-112(e). These findings supplement those already recited earlier in this opinion.
1. Appropriate and timely services were provided by DCF in that they facilitated and arranged supervised visitation between the mother and Jessica. They offered two service agreements which indicated what services DCF was prepared to offer if the mother desired them. The service agreements offered to provide referrals for individual and couples' therapy, treatment for anger CT Page 2182 management; substance abuse assessment, testing and treatment, and parenting skills training. They provided for a psychiatric evaluation by Dr. Schwartz. Beyond that this court has found that the mother had resisted services and denied the need for them, so, to offer them further would have been a futile act. The mother did not even provide a minimal indicia of interest in rehabilitation.
2. Terms of any applicable court order, and the extent to which the parties have fulfilled their obligation under the order. The Court order to provide the mother supervised visitation was complied with until it was no longer in existence. DCF was found in contempt for failure to provide intensive rehabilitation services. Thereafter, it was in compliance with the order of Judge Petroni to provide a service agreement. The order to provide rehabilitation services to the mother implicitly infers that she will participate in such services. She neither inquired into nor sought services.
3. Feelings and emotional ties of the child with respect to parent, and, any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed sufficient emotional tie. The child has strong emotional ties with her foster parents. They have provided for the physical, emotional and educational support that Jessica needs. Jessica has little or no positive emotional ties with her mother: she does not feel safe with her. The mother's comments about Jessica to Dr. Pines and at the one school PPT she attended show that she has no understanding of supportive, proper parental behavior and no insight into the emotional, education and physical needs of Jessica. She has no insight into how she has harmed and hurt Jessica severely, both physically and emotionally.
4. Age of the child. Jessica's birth date is October 29, 1990. She is 8 years old. She requires the continuity of care that will come with a permanent placement. She has been in foster care for 3 years and 11 months. She spent 7 months in foster care when she was 1 year old.
5. Parent's efforts to adjust to her circumstances to make it in the best interest of the child to return child to parent's home in the forseeable future, including:
— extent of parental contact with child; CT Page 2183
— extent of parental contact or communication with child's guardian or custodian.
Jessica's mother has made virtually no effort to have contact with her outside of the scheduled supervised visitation she previously had. She has made no effort to communicate with DCF about Jessica's well-being. She has criticized the foster parents in her communication with Dr. Pines. Julie has not made realistic and sustained efforts to conform herself to acceptable parental standards. She has minimized the severity of her beatings of Jessica. She has terminated her own counseling. She has refused services. She has shown no insight as to her negative impact on Jessica. She has not shown willingness or capacity for growth as a parent.
6. Extent to which the parent has been prevented from maintaining a meaningful relationship with the child by unreasonable acts of child, other parent, or other person or by economic circumstances. While DCF's conduct with this family is subject to criticism, they have not prevented the mother from having a meaningful relationship with Jessica. They facilitated visitation. They offered services initially and were rebuffed by the mother. Mother knew services were available. No unreasonable conduct was noted by DCF, the child, any other person, the terminated biological father, or economic circumstances.
7. Whether DCF has made reasonable efforts to reunite the family. While DCF might have made greater efforts to reunite this mother and child, this court finds it would have been to no avail. Further, the previous termination trial court did not have the benefit of Dr. Pines' reports detailing the significant, lasting and serious negative impact that the mother's physical beating has had on Jessica emotionally. These wounds are so deep and so permanent that they can not be healed. Since the removal of the child on or about March 9, 1995, the court finds by clear and convincing evidence that the efforts of DCF to reunify this family were sufficient, given the situation and circumstances of this mother and daughter.
Jessica has a loving, secure and stable life with her foster parents. They have embraced her with all of her emotional difficulties. Jessica has begun to heal the gaping emotional wounds inflicted upon her by her biological mother. Jessica has been a victim of her mother's physical violence. She has CT Page 2184 sustained a fractured skull from her mother. She has been punched in the head three times by her mother. Her mother won't help herself. Her mother does not care enough about Jessica to write a note, to pick up the phone, to perform some minimal act of expressing care or concern for Jessica. Jessica is 8 years old. She has an immediate need for the security of her safety and the permanency of her present home. Her need for permanency given her years in foster care is urgent.
The court finds that all three grounds for termination and the circumstances have existed over an extended period of time that exceeds one year. The court finds, based upon the testimony and evidence presented, that it would be in Jessica's best interest to terminate the parental rights of Julie at this time. This finding is made after considering Jessica's sense of time, her need for a secure and permanent environment, the relationship that she has with her foster parents, and the totality of all the circumstances. In re Juvenile Appeal (Anonymous), 177 Conn. 663,667-68, 673 (1979). See also, J. Goldstein, A. Freud A. Solnit,Beyond the Best Interests of the Child 99 (1979).
Order
Based upon the foregoing findings, the court determines that it is in the best interest of Jessica for a termination of parental rights with respect to her biological mother Julie M. The parental rights of her biological father Marc M. have been previously terminated by the court. It is accordingly, ordered that Julie M.'s parental rights are hereby terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. A permanency plan shall be submitted within 90 days. The present foster parents shall be accorded first preference for adoption of Jessica. A review Plan for Terminated Child shall be filed in accordance with Federal and State law.
By the, court,
Munro, J.