MEMORANDUM OF DECISION
On April 13, 1999, the Department of Children and Families ("DCF") filed petitions to terminate the parental rights of Tina L., mother, to her children, Anthony L., Ashley L., and Torre C. (the "petitions"). These petitions also sought to terminate the CT Page 3418 parental rights of the fathers of these children: Benjamin A. (a/k/a Benjamin A. V.), father of Anthony; Guy B., father of Ashley: and Sherman C., father of Torre. On February 22, 2000, trial concerning the petitions occurred in this court. For the reasons stated below, the court grants the petitions.
FACTS
The court finds the following facts and credits the following evidence.
A. Background of the Case
Anthony was born on July 14, 1989; Torre was born on October 10, 1991; and Ashley was born on March 21, 1993.
In January, 1995, a neglect petition was filed by DCF concerning each child. On June 2, 1995, they were adjudicated neglected and protective supervision was ordered for six months. Less than four months later, on September 22, 1995, orders of temporary custody were entered and the children were placed in DCF's care and custody. At the time, Ashley was observed to have unexplained marks on her thigh and face. Commitments were ordered in April, 1996 and subsequently extended.
Prior to trial, on November 23, 1999, the court accepted Tina L.'s consents to the termination of her parental rights as to all three children. At trial, on February 22, 2000, Guy B. appeared and was represented by counsel. His consent to the termination of his parental rights as to Ashley was accepted by the court.
Service of the petition on Benjamin A. (a/k/a Benjamin A. V.)[2] was previously confirmed by the court on May 18, 1999 and a default was entered as to him on that date. He did not appear at trial. Sherman C. also did not appear at trial. His lawyer appeared and outlined his diligent attempts to communicate with Sherman C. in Florida, where he resides. Counsel spoke with him by phone in December, 1999 and sent a letter to him on December 3, 1999; a second letter followed on January 5, 2000. Two more letters were sent on February 7, 2000 containing notice of the court appearance scheduled for February 22, 2000; one was refused, the other was returned. Counsel also placed calls to his residence. Sherman C. did not respond. The court entered a default as to him as a result of his failure to appear at trial. CT Page 3419
As to the fathers Benjamin A. and Sherman C., the petitions for termination as their respective children, Anthony and Torre, alleged the grounds of abandonment and no ongoing relationship. In view of their consents, there is no need for the court to make findings concerning reunification, statutory grounds, and other statutory requirements concerning Tina L. and Guy B. Conn. Gen. §17a-112(d).
B. Benjamin A., Father of Anthony
Benjamin A. impregnated Tina L. when she was fourteen years of age; he was twenty-eight at the time. At different points, Tina L. believed he lived in Puerto Rico or in the New London area. but did not know where. She could provide no details as to how to locate him. The original DCF social worker assigned to the case, Ms. Gambrell, who worked on it from 1994 to 1997, was advised that he was somewhere in Puerto Rico. She had no contact with him. He has been whereabouts unknown throughout Anthony's time in foster care, a period now of over four years and four months.
C. Sherman C., Father of Torre
At the time of the filing of the petitions, in April 1999, Sherman C. was living in Alabama. He had then not seen Torre in approximately four years. Shortly after Torre was placed in foster care in September, 1995, he expressed interest in having Torre be placed with him, but after his whereabouts became unknown, DCF lost contact with him. In April, 1996, he contacted Ms. Gambrell and expressed interest in having Torre live with him or his brother, but she did not hear from him for one year. When she heard from him again he said he would be in contact, but it was not until December, 1998 that he contacted DCF again to propose himself as a resource. At that time he was in Florida. It was suggested that he begin by sending written communications.[3]
Exh. 3, a record from the Circuit Court of Houston, State of Alabama, reflects that on May 26, 1998, Sherman C. was placed on probation for four years for possession of a controlled substance. He acknowledged to DCF serving time in jail on a charge related to cocaine. He also was involved in prior domestic violence and an anger management program.
D. The Children And Their Progress In Foster Care
CT Page 3420
Anthony was born to Tina L. when she was fifteen years old. He has not seen his father, Benjamin A. since he was one month old, a period of more than ten years.
Currently, he is doing well at school in New London. He is living in his fourth foster home, where he was placed in 1996. He is one of two children in that home.
He has a close relationship with his brother and sister. He is a thoughtful, quiet, introspective boy. He is happy in his current placement, but sees his brother and sister as his family. He would like to be with them. As the oldest, he feels a sense of responsibility towards his younger siblings.
As more fully discussed below, in 1998 he was briefly placed with a maternal great-aunt in Pennsylvania. After Torre had a severe reaction, all three children were returned to their former foster homes in Connecticut.
Anthony has visited the foster home where Torre and Ashley live, and in which the F-B foster family has stated its willingness to adopt all three children. He has established a rapport with Beth James, a permanency planner at Jewish Family Services, who was assigned for all three children concerning their pre-placement planning. She plans to continue to counsel Anthony concerning the substantial changes which would occur in his life if he is placed with the F-B family. Fortunately, it is located nearby to his current foster home; if he does move there, he will still be able to maintain a relationship with his foster mother, to whom he is attached, and to whom he refers to as "Aunt Betty." He had a strong bond with his mother; he has no memories of his father and does not know his name.
As noted, Torre was born in 1991. He was diagnosed as a failure to thrive infant. Since he was three years old he has been involved with special education services. Currently, he is living in his fifth foster home. He was placed in the F-B foster home in January, 1998.
In July, 1998, after an interstate compact investigation of its appropriateness, Torre and his siblings were placed with a maternal great-aunt in Pennsylvania. Torre had a severe emotional reaction and engaged in out of control behavior, resulting in a two-week stay in a psychiatric hospital. The great-aunt could not handle all three children and they were returned to Connecticut CT Page 3421 in September, 1998.
Torre was again psychiatrically hospitalized in December, 1998 after he tried to run in front of a bus at school. He has been diagnosed with Attention Deficit Hyperactivity Disorder, Depressive Disorder, Post Traumatic Stress Disorder, and Intermittent Explosive Disorder, for which he takes medication.
Over the past year, Torre's behavior has shown much improvement. He has done well in the F-B foster home, but continues to have social problems at school. He is bonded to his foster family and wants to be adopted by them. He calls his foster mother "Mommy" or "Grandma."
He receives counseling from the New London Child Guidance Clinic. His therapist, Ms. Noel Cain, testified at trial. She described his need for a permanency plan. He is subject to setbacks based on change in his life. A permanency plan would give him more stability in his life.
He, too, speaks positively of his siblings and enjoys being with them. In observations of inter-action between the children at the F-B foster home, it was noted that Torre seemed especially pleased when Anthony came to visit.
Torre had a strong bond with his mother. In February, 1999, after Torre had not seen his father for several years, Sherman C. again contacted DCF about Torre. He followed up by sending letters and a photograph.
One visit occurred between them on May 19, 1999. Torre did not remember what his father looked like. An uncle also attended the visit and was proposed as a possible resource for Torre. They were advised by DCF of Torre's recent behavioral difficulties in Pennsylvania. The uncle and his wife concluded they could not become involved. Since the visit, Torre has asked why he has not heard from his father.
Ashley, the youngest, was born in 1993. She, too, is at the F-B foster home, where she was placed in January, 1998. She has done well there. She, too, has a warm, loving relationship with the F-B family. She is doing well at school. No behavioral problems are reported as to her.
At the time of the petition she had been diagnosed with CT Page 3422 migratory arthritic pain in her legs. She was seen by a pediatric rheumatologist for this condition.
She had a strong bond with her mother. She has some memories of her father, but does not ask about him or demonstrate an attachment to him.
E. Efforts to Locate Benjamin A.
In January, 1995, DCF presented to the court an Affidavit Regarding Diligent Search For The Parent concerning Benjamin A. David Springer of DCF averred that Benjamin A.'s whereabouts were unknown. Tina L. was unaware of any of his relatives. Calls were made to Protective Services, telephone information, and the Bureau of Motor Vehicles in Puerto Rico, to no avail. The court ordered that notice of the pendency of the neglect proceedings be published in a newspaper in Old San Juan, Puerto Rico. Publication of such a notice, naming Benjamin A., occurred in February, 1995.
In September, 1995, at the time of the OTC, DCF sought and the court ordered notice by publication in the same newspaper in Puerto Rico. Publication occurred later in the same month.
In April, 1997, DCF presented another diligent search affidavit concerning its inability to locate Benjamin A. and its search for him. Since he was not located in Puerto Rico, publication was once again ordered, this time in The New London Day. Publication concerning a proposed commitment extension occurred on April 24, 1997.
Benjamin A. never responded to any of these notices, nor did he ever contact DCF about Anthony. In March, 1999, the court entered an order finding that DCF had no duty to make further efforts to reunify Benjamin A. with Anthony. As noted above, service of the termination petition on Benjamin A. was ordered and confirmed; he did not respond.[4]
F. Efforts To Locate Sherman C.
In January, 1995, DCF submitted an Affidavit Regarding Diligent Search For The Parent concerning Sherman C. Tina L. and Tina L.'s mother had advised DCF that he was living in Detroit, Michigan or Miami, Florida. They were unaware of any of his relatives. Calls were made to information listings and to Child Protective CT Page 3423 Services in both locations, to no avail. Pursuant to DCF's motion, the court ordered publication service on Sherman C. in the Detroit Free Press and the Miami Herald. Publication occurred in the Miami Herald on February 2, 1995 and in the Detroit FreePress on February 3, 1995.
Similarly, at the time of the OTC, in September, 1995, the court ordered publication in the Miami Herald in order to serve Sherman C. Publication occurred on September 29, 1995. In April, 1997, after receiving an address for Sherman C. in Detroit, the court authorized service on him of a petition to extend Torre's commitment by certified mail, restricted delivery. Service occurred on April 19, 1997. In the petition it was alleged that Sherman C. had had no contact with Torre and was not a resource at the time.
Once again, in March 1998, another diligent search affidavit was submitted, stating that Sherman C. was whereabouts unknown. It was noted that his prior Detroit address had been validated, but that he no longer lived there and had not kept in contact with DCF or with Torre. He responded, since the court's memorandum for June 19, 1998 indicates that he appeared in court on that date. On March 23, 1999, the court found that it was not appropriate to continue to make reasonable efforts to reunify Torre with Sherman C.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. sec; 17a-112(c)(1). The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. The statute does not define the term "reasonable." Our Supreme Court has found that "reasonable" is a term which varies according to its context and is synonymous with equitable, fair, and just, citing Webster's New International Dictionary (2nd Ed.). State v. Antrim, 185 Conn. 118, 122 (1981) (citations omitted). More recently, in the termination of CT Page 3424 parental rights context, the Appellate Court stated that "reasonable efforts mean doing everything reasonable, not everything possible." In re Savanna M., 55 Conn. App. 807,812-813 (1999) (citations and internal quotation marks omitted);In re Jessica B., 50 Conn. App. 554, 566 (1998).
Based on clear and convincing evidence, this court finds that DCF made reasonable efforts to locate Benjamin A. and Sherman C. and that they were unable or unwilling to benefit from reunification efforts. DCF made repeated, reasonable efforts to locate both of these individuals. Benjamin A. was never located. No efforts towards reunification with Anthony could even be begun as to him. As to Sherman C., he drifted in and out of contact with DCF from out-of-state locations. Prior to the filing of the petition as to Torre, he never made himself sufficiently available to DCF for it meaningfully to be able to work with him toward reunification. DCF made reasonable efforts to locate and communicate with him. His single visit with Torre occurred after the petition was filed and was followed by yet another period of abandonment. Due to his lack of interest or inability to make himself available, reunification efforts involving him became exercises in futility. The "law does not require a useless and futile act." In re Antony B., 54 Conn. App. 463, 476 (1999); InThe Interest of Jessica M., 1999 Ct. Sup. 2170, 2180 (February 17, 1999)(Munro, J.). The court's earlier findings that reunification efforts as to them were no longer appropriate were clearly correct, amply supported, and should not be disturbed.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See InRe Michael B., 49 Conn. App. 510, 512 (1998), cert. denied,247 Conn. 919 (1998). Conn. Gen. Stat. sec; 17a-112(c)(3).
DCF has alleged the grounds of abandonment and lack of an ongoing parent-child relationship as to both fathers. The court finds that DCF has proven each ground by clear and convincing evidence.
1. Abandonment
General Statutes sec; 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the CT Page 3425 parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Abandonment focuses on the parent's conduct . . . A lack of interest in the child is not the sole criterion in determining abandonment." In re Roshawn R.,51 Conn. App. 44, 52 (1998) (citations and internal quotation marks omitted).
 The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child;(2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance.
Id. at 53 (citations and internal quotation marks omitted).
"Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In re Migdalia M., 6 Conn. App. 194, 208-209, cert. denied, 199 Conn. 809 (1986) (citation omitted). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "`maintain' implies a continuing, reasonable degree of concern." Id. at 210.
More than a merely sporadic showing of interest, concern or responsibility for the child is required by the statute. In reAngellica W., 49 Conn. App. 541, 551 (1998). In that case, among the factors cited in the trial court's abandonment finding were that the child was contacted only sporadically, and "long periods elapsed when the respondent made no significant attempt to see the child." Id. at 552. Similarly, In re Drew R.,47 Conn. App. 124, 129 (1997), the lower court's adjudication of abandonment was affirmed where "the respondent's contact with his son was random at best. . . ." The respondent also "did not often telephone or write inquiring about his son. . . ." Id. at 130. The Appellate Court concluded, "The minimum interest set forth by the respondent does not come close to overcoming the proof of abandonment. . . ." Id. CT Page 3426
Here, the record shows, clearly and convincingly, that Benjamin A. abandoned Anthony and Sherman C. abandoned Torre. If Benjamin A. was ever involved at all with Anthony it was for the first month of his life, more than a decade ago. In essence, his role was in name only. He has done nothing to maintain any degree of concern for Anthony. The evidence of abandonment could not be more clear.
As to Sherman C., he barely did more than Benjamin A. He did not come close to meeting the minimum attributes of parenthood. He did not see Torre for several years and then only once. after the adjudicatory date, the date when the petitions were filed, which in this case is April 13, 1999. Sherman C. left Torre, with his specialized needs, to be cared for by others. Even if that single visit had occurred before the adjudicatory date, it would have been insufficient to overcome the substantial evidence of abandonment.
3. No Ongoing Relationship
DCF also alleges that there are no ongoing parent-child relationships between Anthony or Torre and their fathers. To prove this ground, DCF must show the absence of "the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional. moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat. sec; 17a-112(c)(3)(D); In re Savanna M.,55 Conn. App. 807, 815 (1999). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal (Anonymous), 181 Conn. 638, 645
(1980) (internal citation omitted). The decisive question is "whether the child has no present memories or feelings for the natural parent." Id. at 646. As the Appellate Court recently noted, "the feelings of the child are of paramount importance."In re Tabitha T., 51 Conn. App. 595, 602 (1999). "Feelings for the natural parent connotes feelings of a positive nature only." Id.
Here, based on the foregoing findings and discussion, the CT Page 3427 evidence is clear and convincing that the required relationships between the children and their fathers are absent. Anthony's relationship with Benjamin A., if it ever had any positive components, has been non-existent for over ten years. He has never known his father, except, perhaps, for the first thirty days of his life. Likewise, until the May, 1999 single visit, Torre had no recollection of Sherman C., which is unsurprising, since he had not seen him for years. In the several months which have ensued, he has been left to wonder, once again, why his father has not contacted him.
Both children are in good foster home settings. Both have been in foster care for over four years, which, for each, is a substantial part of their lives. Both children have expressed their desire to be adopted. The F-B family has expressed interest in adopting both Anthony and Torre, as well as Ashley, each of whom has expressed the desire to be with his or her siblings.
In deciding whether it would be in either child's best interest to permit further time for a relationship with either Benjamin A. or Sherman C. (respectively) to develop, the court may consider several factors. In re Savanna M., 55 Conn. App. at 816. In view of the extensive stay the children have had with their foster families, their bonded relationships with them, the total dearth of contact they have had with their biological fathers (except for the correspondence and single visit with Torre), and the lack of any real relationship between them, it is clearly not in their best interests to permit additional time to pass in foster care in order to allow their fathers to attempt to establish relationships with them. To the contrary, the evidence is clear that both of these fathers have no ability to or interest in doing so.
DISPOSITION OF THE TERMINATION PETITION
In the disposition phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. sec; 17a-112(c)(2); In re Juvenile Appeal (83-CD),189 Conn. 276, 285 (1983). The court can consider all events occurring through the close of the dispositional hearing. Practice Book sec; 33-5. Because of the deleterious effects of prolonged temporary placement, "time is of the essence." for Ashley, Anthony and Torre. In re Antony B., 54 Conn. App. 463,476 (1999); In re Alexander V., 223 Conn. 557, 565 (1992). The CT Page 3428 Appellate Court has "consistently held that to allow a child to languish in foster care is not in the child's best interest." Inre Drew R., 47 Conn. App. 124, 131 (1997).
The evidence is clear and convincing that termination is in all three children's best interests. All three children are living in safe, nurturing environments with loving foster parents who, to them, include their mommy, grandma, or aunt. The plan for the F-B family to adopt all three children seems promising.
Each of these children is entitled to permanency and stability as he or she grows up. If termination were denied, they would remain in prolonged foster care for no reason. Two parents have consented to the termination of their rights. The other two, Benjamin A. and Sherman C., have no relationships with their children. Without question, termination of their parents' rights is in Ashley's, Anthony's, and Torre's best interests.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes sec; 17a-112(d). See In re Tabitha P., 39 Conn. App. 353,362 (1995). A discussion of these factors follows.[5]
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF timely attempted to locate Benjamin A. and Sherman C. Due to their lack of response, services could not be provided and made available to them to facilitate the reunion of Benjamin A. with Anthony and Sherman C. with Torre.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF made timely efforts to locate and communicate with Benjamin A. and Sherman C. Reunification efforts were not possible due to their unresponsiveness.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations CT Page 3429 under such order.
Due to their whereabouts unknown status and lack of response, no court ordered expectations were entered as to either Benjamin A. or Sherman C. DCF fulfilled its obligations to provide court-ordered notice of the proceedings to them.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Based on the foregoing discussion, the court finds that Ashley, Anthony, and Torre are bonded to their foster parents. They had, as of the filing of the petitions, strong bonds with their mother. Their mother consented to the termination of her rights, as has Guy B. as to Ashley. No significant relationship was ever established between Benjamin A. and Anthony or Sherman C. and Torre. Ashley has some memories of her father, Guy B., but does not ask about him or demonstrate an attachment to him.
5) The age of the child.
Anthony is age ten; Torre is age eight; Ashley is about to turn seven. They are in the stable and nurturing settings provided by their foster families. Leaving them in the "limbo" of foster care would not be in their best interests. Over four years in foster care is more than sufficient.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that neither Benjamin A. nor Sherman C. has made reasonable efforts to adjust his circumstances or conditions to make it in their respective sons' best interests to return to either of them in the foreseeable future. Neither has maintained contact with their CT Page 3430 sons, or with their foster families. They did not respond to even be available for any referrals to assist them in adjusting their circumstances and conditions.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
Based on the foregoing discussion, neither Benjamin A. or Sherman C. faced unreasonable interference from anyone or from economic circumstances. Their predicaments are a consequence of their own actions and their failures to act.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interests of Anthony L., Ashley L., and Torre C. for termination of parental rights to enter with respect to the mother, Tina L. and the fathers, Benjamin A., Guy B., and Sherman C. Accordingly, the court hereby grants the petitions to terminate the parental rights of Tina L., Benjamin A., Guy B., and Sherman C.
The court further orders that the Commissioner of DCF is appointed statutory parent to Anthony L., Ashley L., and Torre C. The F-B foster family has stated its willingness to adopt all three children. It is the court's direction that the F-B family receive first consideration. The Commissioner shall file with this court no later than sixty days following the date of judgment a written report of efforts to effect such permanent placement and file the further reports as are required by state and federal law.
It is so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT
[2] For ease of reference, the court will refer to this individual as "Benjamin A." in the balance of this Memorandum of Decision.
CT Page 3431
[3] Additional facts concerning visitation and subsequent events are stated below in section D, at 6.
[4] The facts found in this and the succeeding section F. were gleaned from the court's files concerning Anthony and Torre. Although not presented in exhibits at the trial, the court finds these facts based on judicial notice, pursuant to Connecticut Code of Evidence, sec; 2-1(c). They are not subject to reasonable dispute since they are "generally accepted as true and capable of ready and unquestionable demonstration." Id. "Judicial notice may be taken at any stage of the proceedings." Id. at sec; 2-1(d); State v. Allen, 205 Conn. 370, 382 (1987). Since both respondent fathers were defaulted, no significant purpose would have been served by re-opening petitioner's case merely to identify as exhibits the above-cited documents from the court's files. As provided by P.B. sec; 34-2(a), proceedings of this type "shall at all times be as informal as the requirements of due process and fairness permit."
[5] As stated above, in view of their consents, the court need not make these findings as to Tina L. and Guy B.