MEMORANDUM OF DECISION
On July 16, 1999, the Department of Children and Families ("DCF") filed petitions to terminate the parental rights of Jessica V., mother, to her children, Bolivar G., III ("Bolivar") and Keanu V. These petitions also sought to terminate the parental rights of the fathers of these children, Bolivar G., Jr., father of Bolivar, and Juan R., father of Keanu. Trial concerning the petitions occurred on March 9, 2000. For the reasons stated below, the court grants the petitions.
FACTS
The court finds the following facts and credits the following evidence.
A. Background of the Case
Bolivar was born on December 20, 1993; Keanu was born on February 25, 1996. On April 3, 1996, orders of temporary custody ("OTC") were issued by the court and neglect petitions were filed concerning these children. At the time, both children were living with their mother, but not with either of their fathers.
The precipitating events were diagnoses of Keanu at Windham Community Memorial Hospital (Exh. 1) and at the Connecticut Children's Medical Center (Exh. 2). On March 30, 1996, when he CT Page 3685 was just over one month old, his mother brought him to the first hospital; after examination there he was removed by ambulance to the second. Multiple fractures were found, according to Dr. Betty S. Spivack. Exh. 2, par. 5. Included were a transverse fracture of the right femur, bilateral first rib fractures, a fracture of the second rib, a fracture of the clavicle (collarbone), and a fracture of the scapula (shoulder blade). Id., par. 5. There were also suggestions of a left tibia fracture and other rib fractures. Id. These fractures were each less than five days old. Id. Keanu was placed in a spica cast, which extended over the body trunk and over both thighs. Id., par. 3. His discharge summary from the Connecticut Children's Medical Center noted that he screamed when he was touched on the upper extremity and on the abdomen. His right leg, which had sustained the femoral fracture, was observed to be shorter than his left. Exh. 3.
Dr. Spivack concluded that Keanu had been abused by an adult in three separate incidents. Exh. 2, par. 6. The injuries to his chest were "highly indicative of a forceful throttling injury." Id. This method of abuse "carries a tremendously high risk of mortality. . . ." Id. Evidence of shaking the infant, resulting in the rib fractures, was noted. Id. Dr. Spivack stated that Keanu and Bolivar would be at "high risk of imminent death or disability" should they be sent home. Id., par. 7.
On August 26, 1996, Bolivar and Keanu were adjudicated as neglected children and their care and custody was committed to DCF for up to twelve months. Subsequently, their commitments were extended. On July 29, 1998, the court made findings that reunification efforts concerning either father were not appropriate.
The children were placed in foster care. They have remained in foster care since April, 1996, a period now of almost four years. On December 13, 1996, Jessica V. was convicted of assault in the first degree and risk of injury concerning the abuse of Keanu. She was sentenced to a term of incarceration of ten years, suspended after serving five years. Exh. 12.
At trial concerning the petitions, on March 9, 2000, Jessica V. and her counsel appeared. Her consent to the termination of her parental rights as to both children was accepted by the court.
Neither Bolivar G., Jr. nor Juan R. appeared at trial. Service of the petition concerning Bolivar had been made in hand on CT Page 3686 Bolivar G., Jr. on July 20, 1999; this was confirmed by the Superior Court for Juvenile Matters in Willimantic on August 11, 1999. In addition, he was served by publication. As to Juan R., pursuant to court order, he was served notice of the petition by publication, which occurred on July 23, 1999. This was confirmed by the court in Willimantic on August 11, 1999.
In addition to the service of process described above concerning these individuals, the court appointed attorneys to conduct diligent searches for them. Attorney Thatcher submitted two letters to the court, dated January 24, 2000 and March 8, 2000, summarizing his diligent efforts to locate Bolivar G., Jr. Likewise, Attorney Duhaime submitted letters, dated January 18, 2000 and March 8, 2000, reflecting similar activities concerning Juan R. Neither attorneys' efforts were successful. Bolivar G., Jr. and Juan R. could not be located. Without question, the court acquired jurisdiction over them in order to adjudicate the issues raised by the petitions as to their parental rights, notwithstanding their failures to appear at trial.
As to these fathers, the petitions alleged the grounds of abandonment, failure to rehabilitate, and no ongoing parent-child relationship. In view of her consent, there is no need for the court to make findings concerning reunification, statutory grounds, and other statutory requirements concerning Jessica V. Conn. Gen. Stat. § 17a-112 (d).
B. Bolivar G., Jr., Father of Bolivar
Bolivar G., Jr. was born in 1973, was graduated from high school and became employed in the Willimantic area. He and Jessica V. began dating in 1989. Approximately one year after Bolivar was born in 1993, Bolivar G., Jr. and Jessica V.'s relationship deteriorated and ended following a domestic violence incident, in which he assaulted Jessica V. in Bolivar's presence.
Only after Jessica V. was incarcerated following the abuse of Keanu did Bolivar G., Jr. actively involve himself with DCF; by that point, Bolivar had been in foster care for ten months. At that juncture, he had not seen his son for approximately one year.
C. Juan R., Father of Keanu
Juan R. was born in 1975. He attended school in the Willimantic CT Page 3687 area until the ninth grade and then held a series of jobs. He has an extensive criminal record, including risk of injury, burglary, and assault convictions. Most recently, in February, 1999, he was convicted of assault for the third time. Exh. 11.
He and Jessica V. began dating in 1995. Their relationship was resumed after a hiatus when he returned to Connecticut from New York shortly after Keanu was born. Their relationship ended finally after Keanu was assaulted. DCF met with him concerning Keanu on the day after the OTC was issued. He was asked if he would visit Keanu in the hospital. He declined to do so, saying it would be disturbing to him to see his son in a cast.
D. The Children and Their Progress In Foster Care
Early in their time in foster care, the children were placed with the M. family. The court and DCF emphasized the importance of keeping the two brothers together. Relative resources were considered. In November, 1997, they moved to Mayra V.'s home; she is their maternal aunt. Unfortunately, this placement did not work out.
Mayra V. and her boyfriend were involved in a domestic violence incident in April, 1998, resulting in head injuries and bruised ribs suffered by Mayra V. Both parties were arrested and counseling was directed. DCF required that the boyfriend not live in the home or supervise Bolivar and Keanu without Mayra V. being present. In November, 1998, DCF received a referral concerning Mayra V.'s own children being hit. Despite a full, no-contact court protective order concerning him being in place, the boyfriend was in the home. Bolivar and Keanu disclosed witnessing physical and verbal abuse in the household. Counseling had not been completed.
Bolivar and Keanu were removed from the household on November 6, 1998 and placed in a new foster home. This, too, proved problematic. They remained there only two weeks and, after regressing and engaging in out-of-control behavior, they were once again placed in foster care with the M. family. Both children receive counseling.
Bolivar was evaluated after being placed in foster care at almost three years of age. He was found to be exhibiting delays in all areas of development, most significantly in adaptive and communication areas. He became bonded to the M. family, where he CT Page 3688 lived for one and one-half years until moving to Mayra V.'s home.
Bolivar's behavior improved after being reunited with the M. family. He continues to have adjustment problems at school. He attends a regular first grade class. He is described at school as pleasant, but with minimal interaction, including periods of "shutting down and cowering in the corner of the room." Exh. 7 (Intake and Diagnostic Evaluation by Dr. Susan Ritz, Psychologist).
The M. family provides a warm and supportive family environment. Bolivar has a positive attachment to his foster family; he refers to his foster parents as "mom" and "dad." He calls his biological mother "Jessica."
When examined in October, 1999, he was observed to be anxious, insecure, and needy. Dr. Ritz summarized his status: "Bolivar has experienced multiple traumatic experiences including witnessing of physical abuse, multiple foster placements, and rejection by members of his biological family. He has a tenuous but positive attachment to his current foster family but experiences a great deal of confusion regarding his relationship to other people in his life." Id. at 3. She recommended individual therapy.
Keanu, who has just turned four years of age, remained in a cast for several weeks after entering the hospital in 1996. He, too, became bonded with the M. family when he joined Bolivar there. When he went to live with Mayra V., he was inconsolable, and cried himself to sleep.
He was recently evaluated at the Community Child Guidance Clinic in Manchester. Exh. 6. He is an often angry child. He experiences episodes of rage, and occasionally engages in self-hurting behavior, as well as aggressiveness toward others. Although there are significant concerns concerning his capacity to modulate emotional states, he has significant strengths, including cognitive/problem solving skills, capacity for sustained concentration, and emerging communication and symbolic play skills. Id. He is seen as "an extremely vulnerable child whose developmental progress is jeopardized by a history significant for abuse, multiple caretakers, and multiple placements." Id. at 1. Individual treatment was also recommended for him.
Pursuant to a court-order, an interactional evaluation of the CT Page 3689 children with Jessica V. was conducted by Dr. Nancy Randall, a psychologist, in September, 1999. Exh. 10.
Bolivar was initially very quiet, but eventually began to talk with Jessica V.; he resisted her attempts to get him to talk in more detail about his life. In response to Jessica V.'s request, he gave her a kiss good-bye, but separated easily from her. His relationship with her lacks emotional depth.
Keanu's behavior demonstrated a significant contrast. He resisted coming into the room, said "No," and stood against the wall. He became angry and said he wanted to leave to see his mommy, referring to his foster mother. When told that Jessica V. was his mommy, he resisted this, again referring to his foster mother as "my mom." Keanu retains a lot of anger toward his mother and rejects her as his mother.
Dr. Randall recommends that both children be freed for adoption, in order for them to gain the stability and security they need. She noted it was highly questionable whether either child could ever trust their mother sufficiently to feel comfortable and safe in her care.
Ms. Flatley, the DCF social worker assigned for the family, described the children's affection for their foster parents. Bolivar was observed watching out the window for his foster father to come home from work.
The foster family diligently follows Keanu's medical needs, such as monitoring the leg length discrepancy which remains from his broken femur. The M. family has expressed their willingness and desire to adopt both children.
E. Efforts at Reunification
In 1996, the court ordered evaluations of Jessica V. and of both fathers. Bolivar G., Jr. did not participate in the evaluation which occurred on June 5, 1996. Court-ordered Expectations were entered on August 26, 1996, listing only Jessica V. as a parent. Bolivar G., Jr. finally contacted DCF in January, 1997, months after Bolivar was placed in foster care. He stated he could not provide a home for Bolivar. Visits began in April, 1997. At the first, Bolivar said nothing. Prior to the second, in May, 1997, Bolivar did not want to attend and became extremely upset. Over time, Bolivar G., Jr. established a good CT Page 3690 relationship with Bolivar and was offered unsupervised visitation; Bolivar began to call him "Daddy."
The prospects for this relationship initially seemed promising. In June, 1997, Bolivar G., Jr. entered into a visitation agreement with DCF. Exh. 4. He agreed to participate in parenting classes, and to visit weekly. DCF agreed to facilitate visitation, to provide transportation for the child to visits, and to provide appropriate referrals for parenting education and a substance abuse evaluation. Bolivar G., Jr. did attend the substance abuse evaluation. He did not attend parenting classes.
In November, 1997, he entered into a second agreement with DCF and Mayra V. concerning visitation and other requirements. Exh. 5. This coincided with the children's placement at her home. He agreed to visit Bolivar, to refrain from using alcohol or drugs, and to protect his son.
Abruptly, and without warning, Bolivar G., Jr. stopped visiting Bolivar in February, 1998. He has not visited the child since that time, during which two years have elapsed. He has not been heard from by DCF since that time.[2] Clearly, he violated the two agreements he had signed. In so doing, he violated the hard-won trust of his son, a vulnerable little boy. Bolivar understandably was confused. Subsequently, he has seen his father on the street and ignored him. He has not been in contact with Bolivar or with DCF since February, 1998 nor has he sent any cards, letters, or gifts for Bolivar. Bolivar G., Jr. voluntarily chose to cease contact with Bolivar, making further efforts at reunification impossible.
As to Juan R., he did participate in the court-ordered psychological evaluation in 1996. He was diagnosed by Dr. Miguel Suarez, a psychologist, as depressed and as having a substance abuse problem, concerning marijuana. Exh. 9. At the time he was on probation for assault and risk of injury for fighting a sixteen year old adolescent. He was also unemployed. A drug rehabilitation program was recommended. He was referred for parenting classes and offered assistance with court-ordered expectations. He did not avail himself of any services to which he was referred. After a last appearance for an in-court review on April 29, 1997, he never appeared in court again.
A copy of the court-ordered Expectations, dated August 26, 1996, was sent to Juan R. via his attorney. The Expectations CT Page 3691 included: parenting classes, individual and family counseling, visitation, no substance abuse, no further involvement with the criminal justice system, ongoing contact with DCF, keep whereabouts known to DCF, and sign releases as requested.
DCF referred Juan R. to United Services for counseling, parenting classes, and support groups. He did not pursue any of these services. Regarding visitation, he demonstrated a sporadic interest and then stopped visiting Keanu altogether.
In August, 1996 and December, 1996, he failed to appear for scheduled appointments. Ms. Flatley met with Juan R. and reminded him that Keanu had suffered significant trauma and that visits needed to be consistent. After a period of inconsistent visitation, an October, 1997 visit occurred. When Keanu would not go to him, he responded that if Keanu was not good, he would no longer visit him. Juan R. visited Keanu for the last time on December 25, 1997, more than two years and two months prior to trial. In the interim, he has not sent any cards, letters, or gifts for Keanu.
DCF made a diligent search for Juan R. in the summer of 1999, at the time of the filing of the termination of parental rights petition. He could not be located.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112 (c) (1). The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. The word "reasonable" is the "linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof." (citation and internal quotation marks omitted.) In re Amber B., 56 Conn. App. 776, 784 (2000). Our Supreme Court has found that "reasonable" is a term which varies according to its context and is synonymous with equitable, fair, CT Page 3692 and just, citing Webster's New International Dictionary (2nd Ed.). State v. Antrim, 185 Conn. 118, 122 (1981) (citations omitted). More recently, in the termination of parental rights context, the Appellate Court stated that "reasonable efforts mean doing everything reasonable, not everything possible." (citations and internal quotation marks omitted) In re Savanna M.,55 Conn. App. 807, 812-813 (1999); In re Jessica B., 50 Conn. App. 554,566 (1998).
Based on clear and convincing evidence, this court finds that DCF made reasonable efforts to reunify Bolivar with Bolivar G., Jr. and Keanu with Juan R. Sadly, their dismal efforts at being parents made DCF's efforts futile. DCF promptly attempted to involve both fathers. Both belatedly became somewhat involved with DCF and with their children. Bolivar G., Jr. and Juan R. both declined relevant services. After initial difficulty with starting visitation, Bolivar G., Jr. made real progress with Bolivar, then turned his back on him more than two years ago. Juan R. could not even make himself visit his seriously abused infant son in the hospital. Then, he visited only sporadically and, after that, stopped altogether in December, 1997.
Both fathers made reunification impossible, despite appropriate efforts by DCF toward that end. Then, they dropped out of contact completely and could not be located, even after diligent efforts. Due to their lack of interest or inability to make themselves available, reunification efforts involving them became exercises in futility. The "law does not require a useless and futile act."In re Antony B., 54 Conn. App. 463, 476 (1999); In The Interestof Jessica M., 1999 Ct. Sup. 2170, 2180 (February 17, 1999) (Munro, J.). The court's earlier findings that reunification efforts as to them were no longer appropriate were clearly correct, amply supported, and should not be disturbed.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998), cert. denied,247 Conn. 919 (1998). Conn. Gen. Stat. § 17a-112 (c) (3).
DCF has alleged the grounds of abandonment, failure to rehabilitate, and lack of an ongoing parent-child relationship as to both fathers. The court finds that DCF has proven each ground CT Page 3693 by clear and convincing evidence.
1. Abandonment
General Statutes § 17a-112 (c) (3) (A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Abandonment focuses on the parent's conduct. . . A lack of interest in the child is not the sole criterion in determining abandonment." (citations and internal quotation marks omitted) In re Roshawn R., 51 Conn. App. 44, 52
(1998).
 The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance.
Id. at 53 (citations and internal quotation marks omitted).
"Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In re Migdalia M., 6 Conn. App. 194, 208-209, cert. denied, 199 Conn. 809 (1986) (citation omitted). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "`maintain' implies a continuing, reasonable degree of concern." Id. at 210.
More than a merely sporadic showing of interest, concern or responsibility for the child is required by the statute. In reAngellica W., 49 Conn. App. 541, 551 (1998). In that case, among the factors cited in the trial court's abandonment finding were that the child was contacted only sporadically, and "long periods elapsed when the respondent made no significant attempt to see the child." Id. at 552. Similarly. In re Drew R.,47 Conn. App. 124, 129 (1997), the lower court's adjudication of abandonment CT Page 3694 was affirmed where "the respondent's contact with his son was random at best. . . ." The respondent also "did not often telephone or write inquiring about his son. . . ." Id. at 130. The Appellate Court concluded, "The minimum interest set forth by the respondent does not come close to overcoming the proof of abandonment. . . ." Id.
Here, the record shows, clearly and convincingly, that Bolivar G., Jr. abandoned Bolivar and Juan R. abandoned Keanu. In February, 1998, Bolivar G., Jr. abandoned Bolivar, after they had established a relationship together. He simply never visited or contacted him again. At that time, Bolivar was living with Mayra V. Bolivar G., Jr. left Bolivar to be cared for by others. He has failed to meet the minimum standards for being a parent.
Juan R. did even less and stopped visiting Keanu even earlier. He only visited his son sporadically and then never after December, 1997. He has done nothing since, leaving Keanu, who was the victim of horrific child abuse, and who clearly has specialized needs, to be cared for by others. His behavior, without question, constitutes abandonment.
2. Failure to Rehabilitate
This statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c) (3) (B). The court previously has found each child to have been "neglected," thus satisfying a statutory prerequisite.
The rest of the statute requires the court to find whether the facts encourage the belief that "such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c) (3) (B). This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In reLuis C., 210 Conn. 157, 167 (1989); In re Hector L.,53 Conn. App. 359, 366-67 (1999).
As the Appellate Court recently noted in In re Danuael D., CT Page 369551 Conn. App. 829, 839 (1999), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." At this adjudicatory phase, the questions are whether Bolivar G., Jr. was better able to be a parent to Bolivar and whether Juan R. was better able to be a parent to Keanu when the petitions were filed than at the time of their commitments. See In re Michael M., 29 Conn. App. 112, 126
(1992). As noted, the petitions were filed in July, 1999, almost three years after the children's neglect adjudications in August, 1996.
The evidence is clear and convincing that neither father is able to be a parent to their respective children and that neither could become able to do so within a reasonable time.
Neither father attended court appearances sufficiently to be present when Expectations were ordered. DCF made appropriate referrals for these fathers to receive evaluations, and parenting classes. Counseling was offered for Juan R. Neither father ever embarked on participating in services. Their visits to the children were sporadic. Their willingness to visit their respective sons was short-lived. They did not remain in contact with their children or with DCF. Juan R. has continued to accrue criminal convictions. Bolivar G., Jr admitted early on that he could not provide a home for Bolivar and then proved it by never seeing his son again after February, 1998. The evidence is overwhelming that neither father has been rehabilitated.
During all the time since they were placed in foster care, the children have had to be cared for by others. They are fortunate to be together in a loving foster home, where they are bonded to their foster parents.
Neither father has gained the ability to care for their sons, nor could they within a reasonable time. There is no reason to believe that either is better able to be a parent than he was at the time of the neglect adjudications and commitments. There is no reason to believe that either will be able to assume a responsible position in their children's lives within the foreseeable future.
3. No Ongoing Relationship
DCF also alleges that there are no ongoing parent-child relationships between Bolivar or Keanu and their fathers. To CT Page 3696 prove this ground, DCF must show the absence of "the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat. § 17a-112 (c) (3) (D); In re Savanna M.,55 Conn. App. 807, 815 (1999). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal (Anonymous), 181 Conn. 638, 645
(1980) (internal citation omitted). The decisive question is "whether the child has no present memories or feelings for the natural parent." Id. at 646. As the Appellate Court recently noted, "the feelings of the child are of paramount importance."In re Tabitha T., 51 Conn. App. 595, 602 (1999). "Feelings for the natural parent connotes feelings of a positive nature only." Id. Here, based on the foregoing findings and discussion, the evidence is clear and convincing that the required relationships between the children and their fathers are absent. Bolivar's feelings for Bolivar G. were dashed when he stopped visiting him. Subsequently, the child ignored his father when he saw him on the street. As to Keanu, there is no evidence that he even knows who Juan R. is, which is understandable since he did not see him after December, 1997, when he was one year and nine months old.
Both children are in the same good foster home setting. Both have been in foster care for almost four years, which, for each, is a substantial part of their lives. For Keanu, it is almost his entire life. The M. family has expressed interest in adopting both Bolivar and Keanu.
In deciding whether it would be in either child's best interest to permit further time for a relationship with either Bolivar G., Jr. or Juan R. (respectively) to develop, the court may consider several factors. In re Savanna M., 55 Conn. App. at 816. In view of the extensive stay the children have had in foster care, their bonded relationships with their foster parents, the total dearth of contact they have had with their biological fathers and the lack of any real relationship between them, it is clearly not in their best interests to permit additional time to pass in foster care in order to allow their fathers to attempt to establish relationships with them. To the contrary, the evidence is clear CT Page 3697 and convincing that both of these fathers have no ability to or interest in doing so.
DISPOSITION OF THE TERMINATION PETITION
In the disposition phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112 (c) (2); In re Juvenile Appeal (83-CD),189 Conn. 276, 285 (1983). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5. Because of the deleterious effects of prolonged temporary placement, "time is of the essence," for Bolivar and Keanu. In re Antony B., 54 Conn. App. 463, 476
(1999); In re Alexander V., 223 Conn. 557, 565 (1992). The Appellate Court has "consistently held that to allow a child to languish in foster care is not in the child's best interest." Inre Drew R., 47 Conn. App. 124, 131 (1997).
The evidence is clear and convincing that termination is in both children's best interests. They are living in a safe, nurturing environment with loving foster parents who, to them, are their mom and dad. Hopefully, these troubled children, one of whom was subjected to serious physical abuse, will, in a stable setting, be enabled to put the sad events of their early childhood behind them.
Each of these children is entitled to permanency and stability as he or she grows up. If termination were denied, they would remain in prolonged foster care for no reason. Their mother has consented to the termination of her rights. Bolivar G., Jr. and Juan R. have no relationships with their children. Without question, termination of their parents' rights is in Bolivar's and Keanu's best interests.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112 (d). See In re Tabitha P., 39 Conn. App. 353,362 (1995). A discussion of these factors follows.[3]
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF CT Page 3698 timely attempted to provide services to Bolivar G., Jr. and Juan R. DCF provided foster care and visitation. Due to their lack of response, services could not be provided and made available to them to facilitate the reunion of Bolivar G., Jr. with Bolivar and Juan R. with Keanu.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF made timely efforts to reunify Bolivar G., Jr. with Bolivar and Juan R. with Keanu. Reunification efforts became impossible, futile, and inappropriate due to their unresponsiveness.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
Based on the foregoing discussion, the court finds that the court-ordered expectations were communicated to Juan R. He did not comply. Most important, he failed to visit and remained involved with the criminal justice system. As noted, DCF fulfilled its obligations under the order: Bolivar G., Jr. never made himself sufficiently available to be the subject of such expectations.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Based on the foregoing discussion, the court finds that Bolivar and Keanu are bonded to their foster parents. They had, as of the filing of the petitions, no significant emotional bonds to their mother. Their mother consented to the termination of her rights. Bolivar no longer has positive feelings toward his father. There are no emotional ties between Keanu and his father.
5) The age of the child.
Bolivar is age six; Keanu is age four. They are in the stable and nurturing settings provided by their foster family. Leaving CT Page 3699 them in the "limbo" of foster care would not be in their best interests. Almost four years in foster care is more than sufficient.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that neither Bolivar G., Jr. nor Juan R. has made reasonable efforts to adjust his circumstances or conditions to make it in their respective sons' best interests to return to either of them in the foreseeable future. Neither has maintained contact with their sons or with DCF. They did not respond to even be available for referrals to assist them in adjusting their circumstances and conditions.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
Based on the foregoing discussion, neither Bolivar G., Jr. nor Juan R. faced unreasonable interference from anyone or from economic circumstances. Their predicaments are a consequence of their own actions and their failures to act.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interests of Bolivar G., III and Keanu V. for termination of parental rights to enter with respect to the mother, Jessica V. and the fathers, Bolivar G., Jr. and Juan R. Accordingly, the court hereby grants the petitions to terminate the parental rights of Jessica V., Bolivar G., Jr., and Juan R.
The court further orders that the Commissioner of DCF is appointed statutory parent to Bolivar G. III and Keanu V. The M. CT Page 3700 foster family has stated its willingness to adopt both children. It is the court's direction that the M. family receive first consideration. The Commissioner shall file with this court no later than sixty days following the date of judgment a written report of efforts to effect such permanent placement and file the further reports as are required by state and federal law.
It is so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT
[2] The last court appearance he attended was an in-court review on August 29, 1997.
[3] As stated above, in view of her consent, the court need not make these findings as to Jessica V.