IN RE ANGELLICA W.*
(AC 16886)

Schaller, Hennessy and Sullivan, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book (1998 Rev.) § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued February 27—officially released July 28, 1998

*William J. Shea,* for the appellant (respondent).

*Robin Murdock Meggers,* with whom was *Julia Morris Paul,* for the appellee (petitioner).

*Opinion*

SCHALLER, J. The respondent mother appeals from the judgment of the trial court terminating her parental rights and appointing the petitioner father as the sole parent and guardian of the minor child, Angellica W. The respondent claims on appeal that the trial court improperly (1) allowed the petitioner to amend his petition to allege that there was no ongoing parent-child

relationship, (2) admitted into evidence a report prepared by the department of children and families (department) that detailed the facts and circumstances concerning the respondent's children other than Angellica and (3) found by clear and convincing evidence that the respondent had abandoned her child pursuant to General Statutes (Rev. to 1995) § 45a-717 (f) (1), that there was no ongoing parent-child relationship and that to allow further time for the establishment of a parent-child relationship would be detrimental to the child. We affirm the judgment of the trial court.

The trial court found the following facts relevant to this appeal. The respondent and the petitioner were married in 1989. Angellica was born on April 7, 1990. The respondent and the petitioner lived briefly with the respondent's mother during the early months of Angellica's life. In September, 1990, however, the respondent, the petitioner and Angellica moved into a low income residence known as the Executive Motor Lodge (motor lodge). At that time, the respondent and the petitioner were involved with alcohol and drugs, including cocaine. The respondent and the petitioner argued frequently about the petitioner's failure to help the respondent, his failure to care for Angellica and his "partying" with friends. The respondent testified that during this period, she was "bored, alone, frustrated, depressed and angry." In December, 1990, the respondent took Angellica and left the area with a seventeen year old friend named Gary, without telling the petitioner where they were going or when they would return.

Approximately ten days later, the respondent called the petitioner from Virginia, saying that she was coming back to Connecticut and that she wanted a separation. Within a week, the respondent returned to Connecticut with Angellica. The petitioner observed that when Angellica returned to Connecticut, she was hungry, her

diapers were soaked, she had a rash and there were blisters in her genital area.

The respondent indicated to the petitioner that she planned to take Angellica with her to Florida to stay with her grandparents. The petitioner informed the respondent that because she was on probation and because he had reported that she had left the state, there was a warrant issued for her arrest. The petitioner convinced the respondent that under these circumstances, Angellica might end up in a foster home and, therefore, it was better if she left Angellica with him. In January, 1991, the respondent agreed to leave Angellica in the petitioner's care and never again had custody of the child. The petitioner left the motor lodge and moved in with his mother in January, 1991. He lived with his mother until September, 1992. During that period, the respondent visited occasionally with Angellica.

On April 29, 1992, the petitioner applied to the Manchester Probate Court for custody of Angellica. The petitioner also sought to have the respondent removed as Angellica's guardian, alleging that Angellica had been abandoned by the respondent. The petitioner had cared for Angellica since January, 1991, with the assistance of a friend, Tracy. The petitioner and Tracy married in 1994. The department conducted an investigation and concluded that the allegations of abandonment were unsubstantiated because the respondent had been visiting Angellica occasionally. The court awarded custody to the petitioner and granted visitation rights to the respondent.

On March 9, 1993, the department submitted a second report to the Manchester Probate Court. That report stated that the respondent had made only one visit with Angellica since August, 1992. On March 9, 1993, the petitioner filed for divorce from the respondent in the

Superior Court in Rockville. The court granted a dissolution of marriage on June 21, 1993. The respondent did not contest the divorce and, despite having been served, did not appear in court for the final hearing. The court granted the petitioner sole custody of Angellica, with no visitation rights to the respondent.

In February, 1994, the respondent filed a pro se motion to modify the court's order to allow visitation rights. At a hearing on March 14, 1994, in which the petitioner appeared with counsel and the respondent appeared pro se, the matter was referred to a family services officer. The officer declined involvement in the case because he was informed that a termination of parental rights action had been filed and was pending. Absent a recommendation from family services, no action was taken on the motion to modify the decree of dissolution. The respondent proceeded to Probate Court in Manchester the same day and obtained a statement from the clerk, verifying that no action for the termination of parental rights had been filed in that court. On March 21, 1994, the petitioner filed an action to terminate the respondent's parental rights in the Probate Court for the District of Andover one week after the respondent had sought visitation rights. The matter was subsequently transferred to the Superior Court for Juvenile Matters at Rockville and later tried in the Child Protection Session at Middletown.

Initially, the petitioner requested a termination of the respondent's parental rights based on abandonment, pursuant to § 45a-717 (f) (1).[1] On October 9, 1996, however, the petitioner moved to amend the petition to

---

[1] General Statutes (Rev. to 1995) § 45a-717 (f) provides in relevant part: "[T]he court may approve the petition terminating the parental rights . . . if it finds, upon clear and convincing evidence that the termination is in the best interest of the child and that . . . over an extended period of time which . . . shall not be less than one year: (1) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child;

include the allegation that "there is no ongoing parent-child relationship as defined in General Statutes § 45a-717 (f), and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interest of the child."

Since 1991, the respondent has spent much of her time impaired by drugs and alcohol. She has made attempts to establish visitation with Angellica. These attempts, however, have been thwarted by the petitioner, the judicial system and her own self-destructive behavior. The petitioner and Tracy intended that upon the termination of the respondent's parental rights, Tracy would be in a position to adopt Angellica. The respondent acknowledged that Angellica views Tracy as her mother and that the child's current living arrangements are better than what she could provide. The respondent did not claim that the petitioner and Tracy should not continue to raise Angellica. Instead, the respondent argued that her parental rights should not be terminated.

The last time that the respondent saw Angellica was at a meeting planned by Tracy in July, 1993. There were no visits by the respondent in the years 1994, 1995 and 1996. At the time of trial, there was a parent-child relationship between Tracy and Angellica. At that time, there was no ongoing parent-child relationship between the respondent and Angellica.

---

or . . . (3) there is no ongoing parent-child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child. . . ." The standard contemplated "is not whether the parents have shown *some interest* in their children. Common sense dictates that a parent's obligations toward his or her child go further than a minimal interest." (Emphasis in original.) *In re Rayna M.*, 13 Conn. App. 23, 36–37, 534 A.2d 897 (1987).

The trial court also found the following facts relevant to the disposition of the case. On September 29, 1991, the respondent gave birth to a son, Joshua. The department immediately removed this child from the respondent and placed him in foster care. The respondent failed to visit Joshua for four months even though she was permitted to do so. Joshua was kept in foster care until January 29, 1994, when he was returned to the respondent under the protective supervision of the department. After Joshua's return, the respondent failed to abstain from substance abuse and, as a consequence, the respondent's mother became Joshua's guardian.

In June, 1995, the respondent entered Coventry House, a home for pregnant women with drug and alcohol related problems. The respondent's fifth child,[2] a daughter named Skyla, was born on June 28, 1995. In November, 1995, however, after she had left the Coventry House program, the respondent fled the state with Skyla and went to Tennessee. The respondent left the state after she learned that the department intended to remove Skyla from her care. The respondent remained in Tennessee until August, 1996.

On November 2, 1996, the respondent gave birth to her sixth child, Briana. The respondent maintains that she has been sober since June, 1995. At the time of trial, the respondent was living with her eighteen month old daughter, Skyla, and her two month old daughter, Briana.

I

The respondent first claims that the trial court improperly allowed the petitioner to amend his petition to allege that there was no ongoing parent-child relationship. We are not persuaded.

---

[2] Angellica is the respondent's third child, the first and second children having died at four and two months of age.

The respondent argues that Connecticut case law militates against the granting of a termination petition based on the lack of an ongoing parent-child relationship where no effective visitation rights exist. *In re Valerie D.*, 223 Conn. 492, 526–35, 613 A.2d 748 (1992); *In re Kelly S.*, 29 Conn. App. 600, 616–18, 616 A.2d 1161 (1992). The trial court, however, correctly pointed out that "actually, it's a matter of proof, really, rather than whether they have the right to amend. I think they have the right to amend, to allege whatever they want and the burden is on them to prove whatever they allege." Furthermore, Practice Book § 1055.1, now Practice Book (1998 Rev.) § 35-1,[3] provides that amendments to the petition may be made at any time prior to a final adjudication. We will not disturb the trial court's decision to allow amendments to the petition unless there has been an abuse of discretion. *In re Carl O.*, 10 Conn. App. 428, 437–38, 523 A.2d 1339, cert. denied, 204 Conn. 802, 525 A.2d 964 (1987). Since the rules of practice allow amendment, we cannot say that the trial court abused its discretion in this case by allowing amendment of the termination petition.

## II

The respondent next claims that the trial court improperly admitted into evidence a report[4] prepared by the department that detailed the facts and circumstances concerning the respondent's children other than Angellica. The respondent argues that the information contained in that report was not relevant to the

---

[3] Practice Book § 1055.1 (3), now Practice Book (1998 Rev.) § 35-1 (c), provides in relevant part: "A petition may be amended at any time by the court on its own motion or in response to the motion of any party prior to any final adjudication. . . ."

[4] The report was a supplemental study prepared by the department in response to a request made by the assistant attorney general, who is not a party to this action. The study, dated June 24, 1996, detailed the circumstances and events concerning the respondent's other children. There was no information in the report, however, concerning Angellica.

termination petition and was prejudicial because the court interpreted and applied the facts in the report against the respondent. The respondent contends that the circumstances concerning her and her other children "contribute nothing in determining the certainty or probability of the issues of abandonment, ongoing parent-child relationship or best interests." We disagree.

The trial court, in its memorandum of decision, referred to the facts surrounding the respondent and her other children as bearing upon the parent-child relationship. In admitting into evidence the report prepared by the department, the trial court concluded that the report was relevant and not prejudicial to the respondent. We note at the outset that any mandated department social study reports submitted for the court's use in the dispositional phase; see Practice Book §1043.1, now Practice Book (1998 Rev.) §§ 33-5 and 33-6;[5] may be "filed or considered by the court or used by counsel during the adjudicatory phase of the hearing." *In re Tabitha P.*, 39 Conn. App. 353, 368, 664 A.2d 1168 (1995). " 'Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative.' " (Citations omitted.) *State* v. *Billie*, 47 Conn. App. 678, 683–84, 707 A.2d 324, cert. granted on other grounds, 244 Conn. 933, 717 A.2d 231 (1998). Furthermore, "[o]ur standard of review regarding challenges to a trial court's

---

[5] Practice Book §1043.1, now Practice Book (1998 Rev.) §§ 33-5 and 33-6 provides in relevant part: "(2) Said study shall be marked as an exhibit subject to the right of any party to require that the author, if available, appear for cross-examination.

"(3) The mandated social study or any other written report or evaluation made available to the court shall be made available for inspection to all counsel of record and, in the absence of counsel, to the parties themselves. . . ."

evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . In reviewing claims that the trial court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did." (Internal quotation marks omitted.) *Annecharico* v. *Patterson*, 44 Conn. App. 271, 275, 688 A.2d 1341 (1997).

We conclude that the trial court did not abuse its discretion in determining that the evidence was relevant and that the probative value of the report outweighed any prejudicial effect.

### III

The respondent next claims that the trial court improperly terminated her parental rights pursuant to § 45a-717 (f). To prevail, the respondent must successfully challenge both of the bases of the judgment terminating her parental rights. *In re Kezia M.*, 33 Conn. App. 12, 17, 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993). If either of the grounds on which the trial court relied are upheld on appeal, the termination of parental rights must stand. Id. We conclude that the trial court's decision to terminate the respondent's parental rights was proper.

Before analyzing the respondent's specific claims, we note our standard of review. "We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." (Internal quotation marks omitted.) *In re David E.*, 4 Conn. App. 653, 656, 496 A.2d 229 (1985).

## A

The respondent first claims that the trial court improperly determined that she had abandoned Angellica. We disagree.

We have stated that "[a]bandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." (Citations omitted; internal quotation marks omitted.) *In re Kezia M.*, supra, 33 Conn. App. 17–18.[6]

Moreover, we have identified the minimal parental obligations for determination of whether abandonment has occurred. "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Internal quotation marks omitted.) Id., 18.

In support of its conclusion, the trial court noted the following facts: the respondent tried to contact Angellica only sporadically during the child's infancy;

---

[6] It should be noted that the *In re Kezia M.* court cited General Statutes § 17a-112 (b) as ground to decide the issue of whether a court should terminate parental rights. This section is analogous to § 45a-717 and applies to proceedings in the Superior Court, whereas § 45a-717 applies to proceedings in the Probate Court.

long periods elapsed when the respondent made no significant attempt to see the child; the respondent allowed the petitioner to assume full-time responsibility for Angellica during the first two years of Angellica's life; the respondent pursued her personal, romantic and substance abuse interests with greater devotion and vigor than she engaged in establishing or maintaining a relationship with Angellica; the respondent completely abdicated her parental role; the respondent is contesting this case to satisfy her own needs and not those of the child with whom she has no relationship; when granted court-ordered visitation, the respondent did not follow through in a diligent, purposeful and consistent manner; and the respondent has rarely, if ever, sent the child gifts or cards in the five years since 1991.

The trial court found, by clear and convincing evidence, that the respondent had abandoned Angellica. In light of the facts found concerning the respondent's conduct, it is evident that she failed to manifest a reasonable degree of interest, responsibility or concern for Angellica's welfare. The findings of fact amply support the trial court's conclusion on the issue of abandonment.

## B

The respondent next claims that the trial court improperly determined that there was no ongoing parent-child relationship and to allow further time for the establishment of such a relationship would be detrimental to the child. With respect to this claim, we note that the respondent did not challenge the first prong of this ground under § 45a-717 (f) (3), and that the sole challenge on the second ground is that the trial court "improperly relied on facts and opinions not in evidence" by referring to a textbook in its memorandum of decision. The trial court stated: "Common sense and

the literature suggest that [Angellica] should have permanency in her placement as soon as possible and that further delay would be detrimental to her. See generally J. Goldstein, A. Freud & A. Solnit, Beyond the Best Interests of the Child (1979) p. 99." Contrary to the respondent's argument, the trial court's passing reference to the text concerning the concept of permanency in placement did not involve consideration of the text as evidence nor did it refer to any specific statements in the text. No abuse of discretion resulted. See *Hunte* v. *Blumenthal*, 238 Conn. 146, 165, 680 A.2d 1231 (1996), and *Newman* v. *Newman*, 235 Conn. 82, 106, 663 A.2d 980 (1995), for examples where this text was utilized as secondary authority by our Supreme Court.

The judgment is affirmed.

In this opinion the other judges concurred.