******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE NATALIE J.*
(AC 35785)

Beach, Alvord and Pellegrino, Js.

*Argued October 23, 2013—officially released January 29, 2014***

(Appeal from Superior Court, judicial district of New Britain, Juvenile Matters, Gleeson, J. [neglect adjudication; transfer of guardianship]; T. Santos, J. [motion to open]; Frazzini, J. [motion for revocation of commitment; judgment of dismissal].)

*Angela Christine J.*, self-represented, the appellant (respondent mother).

*Carolyn Signorelli*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Elizabeth Potts Berman*, for the minor child.

*Robert W. Lewonka*, for the guardian ad litem.

*Opinion*

BEACH, J. The respondent mother, Angela J., appeals[1] from the judgment of the trial court granting the motion of the petitioner, the Commissioner of Children and Families, to dismiss her motion to revoke the commitment of her minor child, Natalie J. On appeal, Angela J. argues that the trial court: (1) improperly granted the petitioner's motion to dismiss her motion to revoke commitment on the ground that she failed to establish a prima facie case; (2) abused its discretion by taking judicial notice of the September 15, 2011 social study that was prepared by the Department of Children and Families (department) and entered as a full exhibit during the December 22, 2011 hearing on the neglect petition; (3) abused its discretion by taking judicial notice of, rather than admitting as a full exhibit, Angela J.'s response to the petitioner's summary of facts substantiating neglect; and (4) abused its discretion by excluding a tape recording of a telephone conversation between Angela J. and Natalie that allegedly took place on May 14, 2012. We disagree and affirm the judgment of the trial court.

The following facts are relevant to this appeal. On August 4, 2011, after receiving a referral suggesting physical and emotional neglect of fourteen year old Natalie from the Connecticut Children's Medical Center (medical center), the petitioner sought and was granted an order of temporary custody. In support of its motion for that order, the petitioner submitted an affidavit prepared by Dr. Nina Livingston, the medical director of Hartford Regional Child Abuse Services at the medical center.[2] The petitioner also filed a neglect petition and an affidavit seeking out-of-home placement of Natalie.[3] Along with the neglect petition, the petitioner filed a summary of facts substantiating neglect.[4] Angela J. did not file a response to the petitioner's summary of facts substantiating neglect until eight months after the hearing on the neglect petition.

A preliminary hearing on the order of temporary custody was scheduled for August 12, 2011. At the preliminary hearing, at which Angela J. failed to appear, the court ordered specific steps including, but not limited to, Angela J. and her husband Christopher J., Natalie's father, accepting in-home support services recommended by the petitioner, participating in individual counseling and separate psychological evaluations, and cooperating with Natalie's therapy, as recommended by the department.

A full hearing on the petitioner's neglect petition was scheduled for September 15, 2011.[5] Angela J. was not present at that hearing and the court accordingly entered a default judgment.

On December 22, 2011, the court adjudicated Natalie neglected and found that it was in her best interest to

be committed to the care and custody of the petitioner. The court also granted an order of out-of-state placement pursuant to an approved interstate compact study regarding Natalie's maternal grandmother, Jacqueline S. In making its decision, the court considered: (1) the default judgments entered against Angela J. and Christopher J.[6] for failure to appear; and (2) a social study prepared by the department, dated September 15, 2011, (social study), which was filed with the court as a full exhibit.[7]

According to the social study, Angela J. began experiencing mental health issues, including symptoms of paranoia, when she was terminated from her place of employment.[8] Department social workers reported that Natalie suffered from severe acne, for which Angela J. instructed her not to take prescribed medication, risking permanent scarring. Department social workers noted that Natalie had no history of psychiatric treatment; however, she presented as "very anxious" and suspicious of people in authority and struggled with socializing with her peers and others. The report indicated that Natalie was diagnosed with anxiety disorder as a result of continued exposure to Angela J.'s delusions and insistence that people were following her, watching her, and trying to kill her.

On June 21, 2012, the court approved a permanency plan contemplating the transfer of guardianship of Natalie to Jacqueline S. On June 28, 2012, Angela J. filed an appearance as a self-represented party. On July 19, 2012, Angela J. appeared at the New Britain juvenile court. She filed a number of documents, including a motion to open the December 22, 2011 judgment of neglect, a motion to reconsider the denial of her motion to open judgment, and a petition for a new trial, all of which were denied. On August 15, 2012, eight months after the neglect hearing, Angela J. submitted her response to the petitioner's summary of facts substantiating neglect.

On March 20, 2013, the petitioner filed a required motion for review of permanency plan.[9] The petitioner filed a permanency plan contemplating the transfer of guardianship of Natalie to Jacqueline S., with whom she had been residing since December, 2011.

On May 8, 2013, Angela J. filed a "motion to reinstate guardianship" to her, which is the subject of this appeal. The court and all parties agreed that the motion would be treated as a motion to revoke commitment and the court scheduled an evidentiary hearing for June 10, 2013.[10] On May 23, 2013, the court ordered that the motion be heard in a bifurcated manner: the court would consider first whether the cause for commitment no longer existed, and later, if necessary, whether revocation of commitment was in the best interests of the child.[11]

At the June 10, 2013 evidentiary hearing, the court

took judicial notice of all pleadings in the file including, but not limited to, Angela J.'s response to the petitioner's summary of facts substantiating neglect filed on August 15, 2012, the September 15, 2011 social study entered as an exhibit at the hearing on the neglect petition, and the motion for review of permanency plan and social study filed on May 17, 2012. The court reminded all parties that the subject of the hearing was a motion for revocation of commitment and that the purpose of the hearing was whether the cause for commitment still existed.[12] The court explained to Angela J. that, as a result of the default judgment previously entered following her failure to appear, the facts contained in the neglect petition regarding her mental health and its emotional and physical impact upon her child were taken to be true and could not be challenged. The court explained that all Angela J. could currently do was to show that the circumstances that existed in 2011 no longer existed.[13]

At the outset of the presentation of her case, Angela J., representing herself, attempted to introduce a tape recording of a telephone conversation between herself and Natalie that occurred on May 14, 2012. The court requested an offer of proof. At the close of Angela J.'s description of the content of the tape recording, both counsel for Natalie and counsel for the petitioner objected on the grounds that the evidence proffered was hearsay and not relevant to the issue of whether cause for commitment no longer existed. The court sustained the objection to the introduction of the tape recording.

Angela J. then attempted to introduce her response to the petitioner's summary of facts substantiating neglect, filed on August 15, 2012 (response to summary of facts), as a full exhibit. The court sustained the petitioner's objection on relevancy grounds but explained that it would "take judicial notice of [it] just like I did all other matters that were filed . . . ."

Angela J. also attempted to introduce a letter written by Natalie in September, 2010, and a math exercise completed by Natalie in October, 2010. The court sustained the petitioner's objections on relevancy grounds, explaining that the documents did not provide insight into the current status of the parties.

Other evidence offered by Angela J. included her own testimony and that of her husband, Christopher J., regarding their opinion that there was no basis for the initial adjudication of neglect and commitment of Natalie because Angela J. had never been told that she suffered from mental health issues. They further maintained that the adjudicating court improperly had relied upon the pleadings and social study because the parents were not present at the hearings to refute the allegations contained in those documents.

At the close of Angela J.'s presentation of evidence, counsel for the petitioner, joined by counsel for Natalie, moved to dismiss the motion for revocation of commitment based on Angela J.'s failure to make out a prima facie case for the proposition that the cause for commitment no longer existed. In response to the petitioner's motion to dismiss, Angela J. argued that the holding of *Suprenant* v. *Commissioner of Welfare*, 21 Conn. Supp. 154, 148 A.2d 669 (1958), prevented the court from ever having allowed her "child to be taken away from me in the first place."[14] The court granted the petitioner's motion to dismiss, ruling: "And so [Angela J.] having not offered any evidence that if true would show that as of this moment the cause for commitment no longer exists, she did not make a prima facie case and the motion is dismissed." Angela J. thereafter filed a motion for reconsideration, which the court denied on June 20, 2013. This appeal followed.[15] Additional facts will be set forth as necessary.

I

Angela J.'s first claim is that the trial court improperly granted the petitioner's motion to dismiss for failure to make out a prima facie case for revocation of commitment of Natalie. We disagree.

General Statutes § 46b-129 (m) provides: "The commissioner, a parent or the child's attorney may file a motion to revoke a commitment, and, upon finding that [1] cause for commitment no longer exists, and [2] that such revocation is in the best interests of such child or youth, the court may revoke the commitment of such child or youth. No such motion shall be filed more often than once every six months." This court's analysis in *In re Stacy G.*, 94 Conn. App. 348, 892 A.2d 1034 (2006), provides guidance on applying § 46b-129 (m). "[A] natural parent, whose child has been committed to the custody of a third party, is entitled to a hearing to demonstrate that no cause for commitment still exists. . . . The initial burden is placed on the persons applying for the revocation of commitment to allege and prove that *cause for commitment no longer exists.* . . . If the party challenging the commitment meets that initial burden, the commitment to the third party may then be modified if such change is in the best interest of the child. . . . The burden falls on the persons vested with guardianship to prove that it would not be in the best interests of the child to be returned to his or her natural parents." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 352 n.4.

Practice Book § 15-8 provides in relevant part: "If, on the trial of any issue of fact in a civil matter tried to the court, the plaintiff has produced evidence and rested, a defendant may move for judgment of dismissal, and the judicial authority may grant such motion if the plaintiff has failed to make out a prima facie case." See

Practice Book § 34a-1 (b); see also *In re Devon W.*, 124 Conn. App. 631, 639–41, 6 A.3d 100 (2010) (Practice Book § 15-8 applies in cases involving termination of parental rights).

"The standard for determining whether the plaintiff has made out a prima facie case, under Practice Book § 15-8, is whether the plaintiff put forth sufficient evidence that, *if believed*, would establish a prima facie case, not whether the trier of fact believes it. . . . For the court to grant the motion [for judgment of dismissal pursuant to Practice Book § 15-8], it must be of the opinion that the plaintiff has failed to make out a prima facie case. In testing the sufficiency of the evidence, the court compares the evidence with the allegations of the complaint. . . . In order to establish a prima facie case, the proponent must submit evidence which, if credited, is sufficient to establish the fact or facts which it is adduced to prove. . . . [T]he evidence offered by the plaintiff is to be taken as true and interpreted in the light most favorable to [the plaintiff], and every reasonable inference is to be drawn in [the plaintiff's] favor. . . . Whether the plaintiff has established a prima facie case is a question of law, over which our review is plenary." (Citation omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *Charter Oak Lending Group, LLC* v. *August*, 127 Conn. App. 428, 434–35, 14 A.3d 449, cert. denied, 302 Conn. 901, 23 A.3d 1241 (2011).

Our thorough review of the transcript of the June 10, 2013 hearing indicates that Angela J. failed to introduce any evidence that, if credited, would make out a prima facie case that the cause for commitment no longer exists. Angela J. did not present any new evidence regarding the current state of her mental health issues, as of June, 2013, or whether she was currently able to provide care for Natalie without subjecting her to the emotional, psychological, educational, physical and medical neglect described in the social study. A principal claim Angela J. made at the June 10, 2013 hearing was that she had never been told she had any mental health issues. After a thorough review of the record, we conclude the trial court properly granted the petitioner's motion to dismiss.

II

Angela J.'s claims regarding evidentiary rulings must be viewed in the context of the proceedings. Evidence that may perhaps have been relevant in a hearing on a motion for a finding of neglect is not necessarily relevant in a hearing on a motion to revoke commitment, where the issue is not whether cause for commitment once existed but rather, as discussed earlier in this opinion, whether the cause previously found no longer exists. Here, the court's evidentiary rulings recognized and relied upon this distinction. With this principle in mind, we turn to the distinct evidentiary rulings that

on appeal are claimed to be erroneous.[16]

A

Angela J.'s first evidentiary claim is that the court improperly took judicial notice of the social study. She claims that the social study was inaccurate and that the court was wrong to rely on it during the revocation of commitment hearing because she was not present at the December 22, 2011 hearing on the neglect petition when the social study was admitted into evidence, and therefore was unable to refute the assertions contained in the social study.[17] We disagree.

The following additional facts are relevant. At the June 10, 2013 evidentiary hearing on the motion to revoke commitment, the court took judicial notice of several documents, including the social study. The court provided Angela J. an opportunity to be heard before taking judicial notice of the social study. The court then explained its ruling. It stated that judicial notice of the social study was proper because the social study was admitted as a full exhibit during the neglect adjudication hearing and, in large part, was the factual basis the court relied on in adjudicating Natalie neglected and in determining that commitment was in Natalie's best interest.

Section 2-1 of the Connecticut Code of Evidence provides in relevant part: "A court may, but is not required to, take judicial notice of matters of fact . . . . A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) within the knowledge of people generally in the ordinary course of human experience, or (2) generally accepted as true and capable of ready and unquestionable demonstration." In determining whether a matter is the proper type for judicial notice, courts have "attempted to draw a line between matters susceptible of explanation or contradiction, of which notice should not be taken without giving the affected party an opportunity to be heard[18] . . . and matters of established fact, the accuracy of which cannot be questioned, such as court files, which may be judicially noticed without affording a hearing." (Footnote added; internal quotation marks omitted.) *Wasson* v. *Wasson*, 91 Conn. App. 149, 157, 881 A.2d 356, cert. denied, 276 Conn. 932, 890 A.2d 574 (2005).

"A trial court's determination as to whether to take judicial notice is essentially an evidentiary ruling, subject to an abuse of discretion standard of review. . . . In order to establish reversible error, the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." (Citation omitted; internal quotation marks omitted.) Id., 157–58.[19] In reviewing a trial court's evidentiary ruling, "the question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently . . . . Rather, our inquiry is limited to whether the trial

court's ruling was arbitrary or unreasonable." (Citation omitted; internal quotation marks omitted.) *State* v. *Cancel*, 275 Conn. 1, 18, 878 A.2d 1103 (2005).

Child protection proceedings are civil matters. See Practice Book § 32a-2 (a). In civil matters "[t]he entry of a default constitutes an admission by the defendant of the truth of the facts alleged in the complaint." *DeBlasio* v. *Aetna Life & Casualty Co.*, 186 Conn. 398, 400, 441 A.2d 838 (1982). In this case, when Angela J. failed to appear and to contest the neglect petition and the commitment of Natalie to the petitioner's care, the court was permitted to take the facts contained in the pleadings and the social study to be true and to rely on those facts in making its decision.[20] See, e.g., *Commissioner of Social Services* v. *Smith*, 265 Conn. 723, 732–33, 830 A.2d 228 (2003) (respondent in child support proceeding who fails to respond to pleadings "is deemed to have judicially admitted the underlying facts of the support petition"). As a result of Angela J.'s failure to appear and to participate in the neglect proceedings, the allegations in the neglect petition and the facts in support of commitment contained in the social study became the adjudicatory and dispositional facts in the case. Accordingly, these facts formed the basis not only for the court's decision on the neglect petition and commitment issue, but, once final, also formed the basis for future decisions regarding whether to maintain or revoke that commitment.[21] See *In re Allison G.*, 276 Conn. 146, 160, 883 A.2d 1226 (2005) (when deciding whether to revoke commitment, court is required to consider information upon which earlier adjudication and commitment were based in order to determine whether cause for commitment still exists). At the June 10, 2013 hearing, the court, therefore, acted well within its discretion by taking judicial notice of the social study and considering the facts alleged therein in order to ascertain the previously determined cause for commitment. Only then could the court determine whether the cause for commitment continued to exist. We conclude the court did not abuse its discretion in taking judicial notice of the social study.

B

Angela J. also claims that the court abused its discretion in taking judicial notice of her response to the petitioner's summary of facts substantiating neglect rather than admitting it as a full exhibit. The petitioner argues that the court properly excluded Angela J.'s response to summary of facts as a full exhibit because it was not relevant to the revocation of commitment proceeding. We agree that the court did not abuse its discretion in taking judicial notice of Angela J.'s response to summary of facts and not admitting it as a full exhibit.

First, it quite clearly was proper for the court to take judicial notice of a prior pleading, at least for the fact

of what was filed. Whether information within the document had substantive evidential value is a different question. Relevant evidence is evidence that has "any tendency to make the existence of any fact that is *material to the determination of the proceeding* more probable or less probable than it would be without the evidence." (Emphasis added.) Conn. Code Evid. § 4-1. Relevant evidence is admissible unless otherwise provided. Conn. Code Evid. § 4-2. The trial court has broad discretion in ruling on the admissibility of evidence. The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion and a showing that the ruling resulted in "substantial prejudice or injustice." (Internal quotation marks omitted.) *In re Angellica W.*, 49 Conn. App. 541, 550, 714 A.2d 1265 (1998).

Practice Book § 34a-14 provides that within thirty days of the filing of a neglect petition, a parent, legal guardian or child may file a response to the summary of facts propounded by the petitioner in order to assert that allegations contained in the summary of facts in support of the petition are "irrelevant, immaterial, false or otherwise improper."

The following additional facts are relevant. On August 4, 2011, the petitioner filed a neglect petition as well as a summary of facts in support of the neglect petition. On December 22, 2011, the court adjudicated Natalie neglected. On August 15, 2012, more than one year after the plea date on the neglect petition and eight months after the finding of neglect, Angela J. submitted her response to summary of facts. Angela J.'s response to summary of facts broadly denied the allegations in the neglect petition as well as the allegations in the petitioner's summary of facts substantiating neglect. At the June 10, 2013 hearing on the motion to revoke commitment, Angela J. requested the court to take judicial notice of her response to summary of facts.

We conclude that the court did not abuse its discretion in declining to admit Angela J.'s response to summary of facts as a full exhibit. First, there is no clear indication in the record that Angela J. sought to have the document admitted as a full exhibit at the June 10, 2013 revocation of commitment hearing. Second, even if Angela J.'s goal was admission of the document as a full exhibit, the court did not abuse its discretion in failing to admit it as a full exhibit because the document, which addresses factual circumstances in 2011, was not relevant to the issue to be decided in the revocation of commitment hearing—that is, whether the circumstances as they were in June, 2013, warranted a finding that the previously determined and finally established cause for commitment no longer existed. We therefore conclude that the court did not abuse its discretion in taking judicial notice of Angela J.'s response to summary of facts.[22]

C

Angela J. finally claims that the trial court abused its discretion by excluding a tape-recorded telephone conversation between Angela J. and Natalie. We disagree.

"The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *In re Harlow P.*, 146 Conn. App. 664, 681, 78 A.3d 281 (2013).

Relevant evidence is evidence that has "any tendency to make the existence of any fact that is *material to the determination of the proceeding* more probable or less probable than it would be without the evidence." (Emphasis added.) Conn. Code Evid. § 4-1; see also *In re Angellica W.*, supra, 49 Conn. App. 549 ("Relevant evidence is evidence that has a logical tendency to aid the trier of fact in the determination of an issue. . . . All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." [Internal quotation marks omitted.]). Relevant evidence is generally admissible. Conn. Code Evid. § 4-2. "The proffering party bears the burden of establishing the relevance of the offered testimony. Unless a proper foundation is established, the evidence is irrelevant." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 59, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

One means of suggesting relevance is an offer of proof. Courts are permitted to base their decisions regarding the relevance and admissibility of evidence on the offer of proof and argument made by the proponent of the evidence. "An offer of proof, properly presented, serves three purposes. First, it should inform the court of the legal theory under which the offered evidence is admissible. Second, it should inform the trial judge of the specific nature of the offered evidence so the court can judge its admissibility. Third, it thereby creates a record adequate for appellate review." (Internal quotation marks omitted.) *State* v. *Conrod*, 198 Conn. 592, 597, 504 A.2d 494 (1986).

The following additional facts are relevant. At the June 10, 2013 evidentiary hearing on her motion to revoke commitment, Angela J. attempted to introduce a tape recording of a telephone conversation between her and Natalie. When the court asked Angela J. to provide a foundation, she insisted that she should be

able to play the tape recording without further explanation. The petitioner, through counsel, requested an offer of proof as to the nature of the recording, when it was made, and to whom and to what it referred, and an explanation of how it was relevant to the revocation of commitment proceeding. In response, Angela J. explained that it was a tape recording of a telephone conversation between herself and Natalie on May 14, 2012, during which Natalie told her that her attorney had her sign papers without reading them, that she was repeatedly asked by her attorney, school officials, the petitioner, workers, and others whether she ever ran away from home and that she told them she had not run away, and that when Angela J. appeared in the street outside her residential placement, staff told her to hide.[23]

Subsequently, Natalie's counsel objected, arguing that the offer of proof was insufficient, that the tape recording of the telephone conversation was irrelevant to the revocation of commitment hearing, and that it was inadmissible hearsay. The petitioner also objected on the same grounds, maintaining that there was no representation that the material contained in the tape-recorded conversation was relevant to the issue before the court at the revocation hearing. Angela J. responded to the relevancy objection by stating that the tape recording tended to show that Natalie had been "brainwashed" into believing that she was not safe with her parents. She then began to testify about facts and allegations outside the contents of the tape recording.[24] When the court asked Angela J. to explain how the contents of the tape recording were relevant to the issue of whether cause for commitment still existed, Angela J. responded by stating that the social workers were untruthful and reiterated her claim that the factual information introduced at the December 22, 2011 neglect adjudication hearing was not reliable and was not truthful. The court sustained the objection on the grounds that the offer of proof did not address how the tape recording was relevant to Angela J.'s burden of establishing that the cause for commitment no longer existed. Angela J. claims the court abused its discretion in excluding the tape recording. We disagree.

After a thorough review of the record, we conclude that there is no indication that the tape recording contained evidence relevant to the issue before the court at the revocation hearing. The court, therefore, did not abuse its discretion in excluding the tape recording of the alleged May 14, 2012 telephone conversation between Angela J. and Natalie. Accordingly, we do not conclude that the court erred in dismissing Angela J.'s motion to revoke commitment.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142

(b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** January 29, 2014, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The respondent father, Christopher J., is not a party to this appeal.

[2] According to Livingston's affidavit, on August 1, 2011, Natalie presented at the emergency department because of Angela J.'s persistent concerns that Natalie had been poisoned. Medical tests revealed that Natalie had not been poisoned; however, she was admitted for further evaluation. Angela J. and her husband Christopher J., Natalie's father, attempted to leave with Natalie against medical advice. Livingston attempted to speak with Natalie privately, but Angela J. refused to allow Livingston to speak with Natalie without her being present. Livingston also reported that Angela J. refused to allow her to order a mental health assessment for Natalie.

On August 3, 2011, Livingston was able to speak with Natalie, separate from Angela J., in the presence of an advanced practice registered nurse. Natalie reported to Livingston that Angela J. tells her that "people are trying to poison them, that schools are putting [Natalie] in the wrong classes, and that teachers are telling the kids in [Natalie's] school to say negative things to her. Natalie report[ed] that sometimes she believes that people are watching or following her and it makes her scared and nervous. . . . Sometimes she does not believe the things [Angela J.] says and is bothered by [Angela J.'s] persistent discussion of the games." Natalie also reported that Angela J. "will not separate from her except for school and occasionally to leave her with [maternal grandmother]." Natalie also told Livingston that she did not participate in any extracurricular activities, had no friends, and no regular contact with anyone aside from her parents. A psychological evaluation on August 3, 2011, revealed that Natalie suffered from social anxiety disorder and pervasive developmental disorder, and that she struggled to separate Angela J.'s delusions from reality.

[3] The affidavit seeking out-of-home placement of Natalie stated: "[C]ontinuation in the home is contrary to the welfare of the child because . . . [Angela J.'s] mental health impacts her ability to care for [Natalie]. [Christopher J.] has failed to protect [Natalie] from [Angela J.'s] mental health problems. [Natalie] has been emotionally and physically impacted by parent's actions and statements." The affidavit also stated that the department had made reasonable efforts to keep Natalie in the home prior to seeking an out-of-home placement, including offering safety planning and psychological evaluation services to both parents.

[4] The summary of facts substantiating neglect alleged, in part: (1) "[f]or at least the past two years, [Angela J.] has had paranoid beliefs that have included that the family is being followed and harassed, primarily by [Natalie's] school systems"; (2) "[Christopher J.] has failed to protect [Natalie] from [Angela J.'s] paranoid actions and statements in that he continues to allow [Natalie] to be exposed to [Angela J. and subject to Angela J.'s actions and statements]"; (3) "in the past two years, the family has moved to three different states in part due to [Angela J.'s] beliefs [that] they were being targeted and potentially poisoned . . . by various school systems"; (4) "[a]s a result of the parents' actions and statements, [Natalie] has been subjected to unnecessary medical examinations, and undue stress and anxiety about her participation in school, and social activities"; and (5) "[Angela J.'s] mental health impacts her ability to appropriately care for [Natalie]."

[5] Angela J. did not appear at the court hearings regarding the order for temporary custody and the neglect petition scheduled during August and September of 2011. The trial court found proper service upon Angela J. and that she had notice of the results of each of those hearings.

[6] On December 22, 2012, a default was entered against Christopher J. for failure to appear.

[7] Angela J. and Christopher J. failed to comply with the petitioner's requests throughout the investigation by refusing to meet with department workers, refusing visitation time with Natalie, and refusing to participate in the social study.

[8] Angela J. refused to participate in the social study. Department social workers obtained information about Angela J. from her mother, Jacqueline S., who reported that Angela J.'s mental health issues began when she was terminated from her job and continued and remained untreated.

[9] Pursuant to Practice Book § 35a-14 (f), the petitioner is required to file a permanency plan with the court every twelve months while a child is in

foster care. Under Practice Book § 35a-14 (c), a person who objects to the plan that the petitioner has presented has thirty days in which to file a written objection. If a written objection is filed within the thirty day period, the court must schedule an evidentiary hearing to consider the plan. If no written objection is filed within the thirty day time period, the court may consider and approve or disapprove the plan on the basis of the social study and the arguments of the parties on the date of the scheduled hearing on the motion for review.

[10] Practice Book § 35a-16 requires that "any modification motion to return the child to the custody of the parent without protective supervision shall be treated as a motion for revocation of commitment."

[11] Pursuant to General Statutes § 46b-129 (m), a court ruling on a motion for revocation of commitment must consider two issues: (1) whether cause for commitment no longer exists; and (2) whether revocation of commitment is in the best interests of the child.

[12] The court explained: "As I said to you last week, this does not provide a party a chance to have a retrial on the issues that led to commitment. There was a judicial finding that the child was neglected. There was a judicial decision to commit the child to the [petitioner]. There was an opportunity to contest that—the petition. And the petition was not contested and defaults were entered.

"A default is regarded as allowing the petition for the pleading to be presumed as true and the court treated it that way and was based on the neglect petition and the addendum that was incorporated into the original neglect petition was thereby presumed to be true.

"And you can't—today you can't offer evidence or try to challenge that the facts that the judge found back when the child was committed weren't then true. What your—the burden of proof you face today is to show that whatever the circumstances were when the child was found neglected and committed, there are difference circumstances today such that today there's no longer a cause for commitment."

[13] The court explained to Angela J. that "it's too late to challenge whether [the facts in the neglect petition, taken to be true because there was a default judgment] were true back in 2011. All you can try to do now is show that whatever the circumstances were in 2011, those circumstances no longer exist."

That decision, of course, had become final and the appeal period had expired.

[14] Angela J.'s reliance on this nonbinding Superior Court case is unavailing. In *Suprenant* v. *Commissioner of Welfare*, supra, 21 Conn. Supp. 154, the court found there was no evidence presented at trial that the parents' issues were affecting the child. Whereas, in the present case, at trial, there was ample evidence in the pleadings and social study of the negative effects that Angela J.'s mental health issues had on Natalie.

[15] The petitioner's appellate brief states: "Angela J. indicated in her [n]otice of [a]ppeal that she was appealing the June 20, 2013 denial of her [m]otion for [r]econsideration . . . . However, her preliminary statement of issues and brief claim[ed] errors in the court's evidentiary rulings and its decision to grant the [m]otion to [d]ismiss . . . ." This procedural information appears to be provided for the purpose of clarification only and does not affect our ability to consider Angela J.'s appeal.

[16] Ordinarily we would see no reason to consider other claims when we have found that there was insufficient evidence to survive a motion to dismiss. In this case, however, because the disposition of both the sufficiency issue and of the evidentiary issues are interrelated and governed by the same controlling principle, we consider it useful to discuss all issues.

[17] The petitioner argues that the court properly took judicial notice of the social study because Angela J. was given an opportunity to be heard at the revocation hearing and the social study contained information from which the court could assess whether or not the cause for commitment still existed. We agree that the court properly took judicial notice of the social study.

[18] See also *In re Jeisean M.*, 270 Conn. 382, 402, 852 A.2d 643 (2004) (so long as parties are offered opportunity to be heard, court may notice any fact concerning parties and events of case appropriate for judicial notice).

[19] See also *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 383, 999 A.2d 721 (2010) ("[b]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful" [internal quotation marks omitted]).

[20] Practice Book § 35a-9 provides: "The judicial authority may admit into evidence any testimony relevant and material to the issue of the disposition, including events occurring through the close of the evidentiary hearing, but *no disposition may be made by the judicial authority until any mandated*

*social study has been submitted to the judicial authority.* Said study shall be marked as an exhibit subject to the right of any party to be heard on a motion in limine requesting redactions and to require that the author, if available, appear for cross-examination." (Emphasis added.)

[21] See Practice Book § 35a-14A ("[w]hether to revoke the commitment is a dispositional question, based on the prior adjudication, and the judicial authority shall determine whether it is in the best interest of the child to maintain or revoke upon a fair preponderance of the evidence"). "The court, in determining whether cause for commitment no longer exists, would obviously look to the original cause for commitment to see whether the conduct or circumstances that resulted in commitment continue to exist. *In re Cesar G.*, 56 Conn. App. 289, 294, 742 A.2d 428 (2000). Accordingly, the trial court considers not only the adjudication, but also the attendant facts. See id., at 294–95 (concluding that trial court, when deciding whether to revoke commitment, properly considered facts set forth in trial court's memorandum of decision ordering original commitment of child)." (Internal quotation marks omitted.) *In re Allison G.*, 276 Conn. 146, 160, 883 A.2d 1226 (2005).

[22] Additionally, by taking judicial notice of Angela J.'s response to summary of facts, the court was able to consider the document's contents. Nothing additional would have been accomplished if the document had been admitted as a full exhibit.

[23] The following colloquy occurred among counsel, the court, and Angela J.

"[The Petitioner's Counsel]: Your Honor, I object to—I would ask for an offer of proof . . . [and] how it is relevant to this proceeding.

"[The Court]: All right. Would you state that, please, [Angela J.]

* * *

"[Angela J.]: It's a recording of me and my daughter, [Natalie] . . . .

"[Angela J.]: . . . . And the only reason why I even made this recording . . . was because she was just telling me too many things that got me concerned. She is heard on this recording multiple times stating that her lawyer . . . had her sign paperwork and told her not to bother reading what she signed. . . . [She said] that the Connecticut [department] workers . . . her lawyer . . . and Winifred House employees kept asking her repeatedly if she ever ran away from me when her and I lived . . . [in] Florida. She's heard repeatedly on this recording stating no, no, I told them . . . I never ran way. . . .

"She also states on this recording that her lawyer . . . her social worker . . . they all told her that she was going—flying to . . . Florida just for a visit. They all told her it was just for a visit, never told her it was going to be permanent . . . . She says that [her social worker] finally told her five minutes before the plane lands in . . . Florida that it's not just a visit, she's going to be there permanently [living with her grandmother.] . . .

"[Natalie's Counsel]: Your Honor, at this point I'm going to object.

* * *

"[Angela J.]: She's also on this recording talking about the time when I showed up at the Winifred House. . . .

"I showed up there twice and Natalie is talking on this recording telling me how people at Winifred House were telling her to hide. They told her to hide in the basement. They told her to hide again the second time I showed up . . . . They locked all the doors and windows on the first floor and she—and she's heard just—I say well, why—why do you think they did that? I don't understand. And she says, well, they thought you were going to take a picture of me.

"That's her thought process because Natalie is not thinking I'm like going to hurt her in any way or—she knows that I'm not a neglectful parent. She in her mind, she processes my question and it can be heard on [the tape recording] that she thinks that they locked the windows and doors and told her to hide because I might take a picture of her. And that's the thought processing going on with [Natalie]. It's not a thought process . . . that states she was in fear . . . of anything."

[24] The following colloquy occurred among counsel, the court, and Angela J.

"[The Court]: Okay. Now there's an objection from the child's attorney.

"[Natalie's Counsel]: Well, Your Honor, it doesn't appear to be relevant to this proceeding. The court had indicated the purpose of this hearing is for a motion to revoke commitment. And pursuant to the facts as alleged in the petition for an adjudication of neglect, there is nothing there regarding Natalie, an assertion that Natalie ran away as a basis for the neglect adjudication. I don't think it's relevant to this proceeding.

"Additionally, I would object to it being hearsay as an out-of-court statement offered . . . to prove the truth of the matter asserted.

* * *

"[The Petitioner's Counsel]: The state would object, Your Honor, for the same reasons. There's nothing in [Angela J.'s] offer of proof as to what is on the recording that would be beneficial to the court that speaks to . . . that speaks to her burden that the cause for commitment no longer exists.

"[The Court]: So what's your response to the objection?

"[Angela J.]: I have definitely responses. A lot of times when I speak to Natalie on the telephone she keeps saying things like Winifred House workers said I'm safe now. . . . She recently told me . . . my lawyer said that it's not a good home environment for me to live in. So why am I bringing all this up because I feel that our child has been brainwashed into thinking she's not safe with my husband and I. . . . And this goes even further. My mother, Jacqueline [S.] . . . started to put fear in our daughter's head . . . .

"[The Petitioner's Counsel]: Your Honor, I would object that this response is not responsive—

* * *

"[The Court]: We're just talking that this particular tape, why do you maintain this particular tape is relevant here and contains information that's relevant to the issue about whether the cause for commitment no longer exists?

"[Angela J.]: Because anything . . . [department] social worker[s] would have sworn to in court that day was not the truth, Your Honor. . . . And I have proof that other social workers are fudging the facts . . . .

"[The Petitioner's Counsel]: Your Honor, this does not go to the . . . .

"[Angela J.]: And . . . exactly what he fudged was put into the case plan and it's those case plans that [the department] . . . rely on . . . [and] that help them write up their permanency plans. And so it does have a direct impact on everything. . . .

"[The Petitioner's Counsel]: Your Honor, I would object to this . . . .

* * *

"[Angela J.]: . . . [And] anything that was introduced into court by [department] employees at any given time, namely December 22, 2011, can't be possibly relied upon as . . . being the truth, Your Honor.

"[The Court]: All right. I'm going to read the exhibit that was introduced at the commitment hearing. . . . Okay. The objection is sustained.

"[The Petitioner's Counsel]: I would ask that the record be stricken as to that.

"[Angela J.]: I'm sorry?

"[The Court]: No. That was her argument of why—denied. [T]he objection [to the tape-recorded phone conversation] is sustained because the causes for commitment as evidenced by the neglect petition and the social study were the mother's mental health issues, the father's failure to protect the child from the mother's mental health issues and the impact of both of these on the child."